**In re:  Plaintiff–Appellant:  The PEOPLE of the State of Colorado,**

v.

**Defendant–Appellee:  Robert Eliot HARLAN.**

**No. 03SA173.**

Supreme Court of Colorado.

March 28, 2005.

As Modified on Denial of Rehearing April 18, 2005.*

* Justice KOURLIS and Justice RICE would grant   the Petition.

Don Quick, District Attorney, Seventeenth Judicial District, Michael J. Milne, Senior Deputy District Attorney, Bradley V. Varmo, Deputy District Attorney, Brighton, Steven L. Bernard, Chief Deputy District Attorney, Nineteenth, Judicial District, Acting as Special Deputy District Attorney, for the Seventeenth Judicial District, Greeley, for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, Kathleen A. Lord, Chief Appellate Deputy Public Defender, Denver, for Defendant–Appellee.

Burns, Figa & Will, P.C., Michael J. Norton, Englewood, for Amicus Curiae in Support of Plaintiff–Appellant.

HOBBS, Justice.

Pursuant to C.A.R. 21, we review the prosecution's challenge to the trial court's judgment vacating a jury verdict imposing the death penalty on Robert Eliot Harlan and imposing a sentence of life imprisonment without the possibility of parole. We uphold the trial court's order and judgment, and discharge the rule.

Previously, we affirmed Harlan's death sentence. *People v. Harlan*, 8 P.3d 448 (Colo.2000). In 1995, a jury found Harlan guilty of raping and murdering Rhonda Maloney and shooting Jaquie Creazzo, who tried to rescue Maloney when she escaped from Harlan's car. In pursuit, Harlan shot Creazzo and left her paralyzed for life. He then seized Maloney from Creazzo's car, drove

away with her, and proceeded to savagely beat and ultimately kill her. We upheld Harlan's conviction and death sentence on appeal. *Id.* at 501.

In that opinion, we expressed particular concern about the voir dire that resulted in the jury's selection. Several of the jurors who were seated had expressed views favoring the death penalty for all persons convicted of first degree murder. However, they all answered in response to follow-up questions that they would listen to the evidence, follow the court's legal instructions in the guilt and penalty phases of the trial, apply the four-step process for the penalty phase as the trial court would instruct, and not automatically vote for the death penalty. While we were "deeply troubled by the number of times the trial court failed to resolve contradictory or equivocal statements by jurors," *id.* at 465, and characterized the voir dire as "inherently problematic," *id.* at 468, we concluded that the trial court's voir dire rulings were supported by the evidence and were constitutionally sufficient. *Id.*

After considering Harlan's numerous legal contentions, accepting some but rejecting most, we found no legal basis on which to set aside the jury's death penalty verdict. We then proceeded with our duty to independently review the verdict under former section 16–11–103(6)(a) and (b), 8A C.R.S. (Cum. Supp.1994).[1] *Id.* at 498–501. This two-part inquiry requires us to find that the death penalty is appropriate under the circumstances of the case and that the jury did not impose it under the influence of passion, prejudice, or any other arbitrary factor.

As to this first inquiry, we upheld the propriety of the death sentence based upon the evidence of Harlan's heinous acts:

In light of the duration during which the defendant terrorized his victim and her would-be rescuer; the degree of violence he inflicted on Maloney before her death; and the extent to which she suffered, we conclude that the nature of the defendant's offense is comparable to cases in which we have upheld the propriety of the death sentence.

*Id.* at 498 (internal citations omitted).

As to the second inquiry, whether passion, prejudice, or some other arbitrary factor influenced the death penalty verdict, we examined Harlan's contention that racial bias may have been a factor in the imposition of the death sentence. We determined that the record as a whole supported the finding that "racial prejudice did not undermine the fundamental fairness of the defendant's trial." *Id.* at 499.

Accordingly, we upheld the jury's death penalty verdict and remanded the case to the trial court for further proceedings. *Id.* at 501. Subsequently, the trial court took up Harlan's motion to vacate his death sentence due to jury misconduct. Harlan alleged that the jury introduced one or more Bibles into the jury room during deliberations and used the texts to demonstrate an authoritative passage commanding imposition of the death penalty for the crime of murder, all without authorization by the trial court. The evidence adduced at the trial court's hearing shows that: (1) one or more jurors brought a Bible, a Bible index, and hand-written notes containing the location of biblical passages into the jury room to share with another juror during deliberations in the penalty phase of defendant's trial; (2) these extraneous materials contained a passage commanding the death penalty for murderers and another instructing obedience to civil authorities; and (3) these passages were pointed out

---

1. Former subsection (6), now relocated to 18–1.3–1201(6), C.R.S. (2004) without modification to relevant portions, provided:
   (a) Whenever a sentence of death is imposed upon a person pursuant to the provisions of this section, the supreme court shall review the propriety of that sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, *including the sufficiency and accuracy of the*

*information on which it was based.* The procedures to be employed in the review shall be as provided by supreme court rule.
   (b) *A sentence of death shall not be imposed pursuant to this section if the supreme court determines that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor* or that the evidence presented does not support the finding of statutory aggravating circumstances.
   (emphasis added).

by at least one juror to another juror before the jury reached its unanimous verdict imposing the death sentence. The trial court concluded that there was a reasonable possiblity that use of the Bible in the jury room to demonstrate a requirement of the death penalty for the crime of murder would have influenced a typical juror to reject a life sentence for Harlan. Therefore, the trial court found that Colorado's legal standards require reversal of the jury's death sentence verdict in this case.[2]

Because competent evidence in the record supports the trial court's findings of fact and the court's legal conclusions are correct, under CRE 606(b) and applicable case law, we uphold the trial court's order vacating Harlan's death sentence and imposing a sentence of life imprisonment without the possibility of parole.

In light of the trial court's findings, and exercising our independent responsibility to review the death sentence under former section 16–11–103(6)(b), we can no longer say that Harlan's death sentence was not influenced by passion, prejudice, or some other arbitrary factor. *See Harlan,* 8 P.3d at 499–501.

## I.

In 1995, defendant Robert Harlan was tried for the 1994 kidnapping, rape, and murder of Rhonda Maloney and the shooting of Jaquie Creazzo. The prosecution elected to pursue the death penalty. After the trial had commenced, a news broadcast aired the statement of a witness suggesting that Harlan had been involved in another uncharged crime. The court ordered sequestration of the jury.

Presentation of evidence concluded, and the jury found Harlan guilty of first degree murder, two counts of attempted first degree murder, two counts of second degree kidnapping, and one count of assault.

On Friday June 30, 1995, the sequestered jury began its penalty phase deliberations.

During the course of the trial, the court admonished the jury several times to focus only on the evidence and law presented at the trial and to avoid any outside discussion or information about the case.

During preliminary jury voir dire, the judge instructed the prospective jurors that sentencing phase deliberations, if needed, must focus solely on the evidence presented at trial and that the jury would be required to carefully follow the trial court's instructions:

> During the penalty phase of the trial, if one is necessary, the jurors will decide, based upon the evidence presented at trial and during the penalty phase, and by following carefully the *instructions of the Court* stating the applicable law, whether the death penalty will or will not be imposed.

When the jury panel had been selected and trial was set to begin, the trial court told the jury that it was to base its decision on the evidence in the case and "nothing else whatsoever:"

> [D]on't discuss this case with anyone.
>
> . . . .
>
> Anything appears on television, turn off the television. Go to another room . . . .
>
> . . . .
>
> [H]ave somebody look at the newspaper before you do to make sure that nothing in regard to the trial is in the newspaper, and if there is, take that section out and let you see only the sections that don't have reference to the trial in it; and that's not just this trial, that's the criminal justice system as a whole, anything that may be happening in any of the other trials that may be going on around the state or around the nation.
>
> I just want you to come to this court focused on this case ready to listen to the evidence in this case and to *base your*

2. The prosecution argues in its brief that the trial court did not make sufficient findings that the Bible materials in the courtroom were improperly introduced and that prejudice resulted from their use. Reviewing the trial court's written ruling, we disagree. The trial court sufficiently addressed and made the required findings, based on competent evidence, which support its legal conclusion vacating the death sentence.

*decision only on evidence that you get at this trial, nothing else whatsoever.*

(emphasis added).

Before opening statements began, the court admonished the jury that only the evidence presented and the law as explained by the court were appropriate for consideration, even if the jurors disagreed with or did not understand the rules of law:

> Your purpose as jurors is to decide what the facts are and your decision must be *based solely upon the evidence presented in this courtroom.*
>
> It's my job to decide what rules of law apply to the case. *You must follow all the rules as I explain them* to you. You may not follow some and ignore others.
>
> *Even if you disagree with or don't understand the reasons for some of these rules, you must follow them.* You will then apply these rules to the facts which you have determined from the evidence.

(emphasis added).

At the end of the first day of trial, the trial court told the jury not to go looking for facts outside the courtroom:

> *[D]on't try to find out any facts about this case outside this courtroom.*
>
> . . . .
>
> There are going to be reports in the papers. There are going to be reporters. . . . It's going to be in the paper tomorrow morning. Don't read that.
>
> . . . .
>
> There's going to be news, televised reports. . . . Don't watch any of those. Don't let anyone tell you about them.
>
> . . . .
>
> Don't expose yourself to any of that material while this trial is going on.
>
> . . . .
>
> [D]on't read anything about any articles or reports that have to do with the criminal justice system. . . .
>
> . . . .
>
> I don't want you to follow the O.J. Simpson trial. . . . I don't want you to

watch Court TV. . . . I want you to focus on this trial.

(emphasis added).

When the trial judge sequestered the jury, he emphasized precautions against external influences on their decision:

> Your freedom is going to be restricted somewhat.
>
> . . . .
>
> There will be an opportunity for you to speak to your family. However, that's going to be in the presence of one of the court bailiffs. It just has to be that way. And there won't be a television or telephone in your hotel rooms.

When jurors began their penalty phase deliberations, the trial court read to them the instructions for their sentencing determination. Again, the trial judge emphasized that the jury must base its verdict on the evidence in the case; must carefully follow the court's legal instructions; must not base its decision on passion, prejudice, or some other arbitrary response; but that it could consider mercy or sympathy for Harlan based on his allocution statements. In addition, the court instructed the jury that any verdict imposing the death penalty must be unanimous:

> During the course of the trial *you received all of the evidence you may properly consider* to decide the case.
>
> . . . .
>
> *Colorado law requires that you carefully follow the legal guidelines the Court will give you* in making your decisions about whether Robert Harlan will be sentenced to life in prison, without any possibility of parole or whether he will be sentenced to death.
>
> . . . .
>
> You are instructed that *you may consider mercy or sympathy for Robert Harlan arising out of the evidence and his statements in allocution* to you as mitigation in this case.
>
> However, *the law requires that your decisions not be the result of a passion, prejudice or other irrational or arbitrary emotional response against Robert Harlan.*
>
> . . . .

*Before imposing a death sentence, you must be unanimously convinced beyond a reasonable doubt that death, rather than life, is the appropriate penalty* for the defendant.

This consideration involves a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or the imposition of the death penalty.

. . . .

[Y]ou must still all make a further individual moral assessment of whether you've been convinced beyond a reasonable doubt that the death penalty instead of life in prison is the appropriate punishment. . . .

. . . .

[Y]ou *should attempt to arrive at a reasoned judgment as to whether you have been convinced beyond a reasonable doubt that the mitigating factors do not outweigh the aggravating factor or factors.*

(emphasis added).

Based on the trial court's findings of fact at the evidentiary hearing and evidence in the record, the following occurred. The jury deliberated on the penalty phase late into Friday evening, but did not reach a unanimous verdict. Several jurors studied Bibles Friday night in their hotel rooms, looking for passages relating to capital punishment and a citizen's duty to obey the law, and took notes on the location of particular passages.

Juror Eaton–Ochoa took notes on two passages. The first was *Leviticus* 24:20–21:[3] "[f]racture for fracture, eye for eye, tooth for tooth, as he has caused disfigurement of a man, so shall it be done to him. And whoever kills an animal shall restore it, but whoever kills a man shall be put to death." The second was *Romans* 13:1: "[l]et every soul be subject to the governing authorities for there is no authority except from God and

the authorities that exist are appointed by God."

Juror Eaton–Ochoa brought a Bible into the jury room Saturday morning when deliberations resumed. Other jurors testified that more than one juror brought in a Bible, and that one of the Bibles present contained a study index with which a reader could locate passages on particular subjects. Jurors Eaton–Ochoa and Trujillo also brought their notes on biblical passages into the jury room. Juror Eaton–Ochoa showed juror Cordova the Bible text from Leviticus commanding the death penalty for murder, as well as the Romans text. By noon that day, the jury returned a unanimous verdict imposing the death penalty on Harlan.

Approximately three months after the jury's death penalty verdict, defense counsel's investigator, Raelee Knapp, contacted jurors to interview them about their jury service. She spoke with five jurors who consented to interviews.

Juror Trujillo, the first juror to whom Knapp spoke, mentioned the presence and use of one or more Bibles and notes in the jury room. The other four, Eaton–Ochoa, Nowakowski, Wright, and Salter, confirmed this occurrence in their interviews.

Harlan promptly filed his "Motion to Vacate the Death Sentence Due to Jurors' Use of the Bible During Penalty Phase Deliberations" (Bible Motion). When we were considering Harlan's direct appeal, he asked us to first grant a limited remand to the trial court so that it could decide the Bible Motion. We declined, leaving that matter for later trial court decision.

After an intervening C.A.R. 21 decision in which we reinstated Harlan's trial counsel for the sole purpose of pursuing the Bible Motion,[4] the trial court held an evidentiary hearing and determined that the death penalty

---

**3.** These quotations are taken from the record, in which counsel read from juror Yantis–Cummings's Bible, a New Scofield Study Version. This is the Bible that Eaton–Ochoa used on Friday night and from which she took her notes, and may have been one of the Bibles present in the jury room on Saturday.

**4.** Harlan had filed a post-conviction motion requesting conflict free counsel to investigate any possible ineffective assistance of counsel claims related to the public defender's management of his trial. Harlan then waived any possible conflict related to his trial counsel arguing the Bible Motion, and we ruled that the public defender could proceed on his behalf. *People v. Harlan,* 54 P.3d 871 (Colo.2002).

verdict must be vacated and life imprisonment without parole imposed.

## II.

The evidence adduced at the trial court's hearing shows that: (1) one or more jurors brought a Bible, a Bible index, and handwritten notes containing the location of biblical passages into the jury room to share with another juror during deliberations in the penalty phase of defendant's trial; (2) these extraneous materials contained a passage commanding the death penalty for murderers and another instructing obedience to civil authorities; and (3) these passages were pointed out by at least one juror to another juror before the jury reached its unanimous verdict imposing the death sentence. The trial court concluded that there was a reasonable possiblity that use of the Bible in the jury room to demonstrate a requirement of the death penalty for the crime of murder would have influenced a typical juror to reject a life sentence for Harlan. Therefore, the trial court found that Colorado's legal standards require reversal of the jury's death sentence verdict in this case.

Because competent evidence in the record supports the trial court's findings of fact and the court's legal conclusions are correct, under CRE 606(b) and applicable case law, we uphold the trial court's order vacating Harlan's death sentence and imposing a sentence of life imprisonment without the possibility of parole.

In light of the trial court's findings, and exercising our independent responsibility to review the death sentence under former section 16–11–103(6)(b), we can no longer say that the death penalty verdict was not influenced by passion, prejudice, or some other arbitrary factor. *See Harlan,* 8 P.3d at 499–501.

We turn first to defendant's argument that we do not have jurisdiction to review the trial court's judgment vacating the death sentence. We then proceed with our CRE 606(b) inquiry into competent evidence of juror misconduct during deliberations.

## A. Jurisdiction Under C.A.R. 21

■ Harlan contends that there is no statute authorizing the prosecution's appeal of the trial court's order vacating his death sentence. The prosecution cites two provisions for its asserted appeal right. Section 18–1–410(3), C.R.S. (2004), provides that "an appeal of any order by the district court granting or denying postconviction relief in a case in which a sentence of death has been imposed shall be to the Colorado supreme court." Section 13–4–102(1)(h), C.R.S. (2004), provides that the court of appeals does not have jurisdiction over appeals from the final judgments of district courts in "[c]ases appealed from the district court granting or denying postconviction relief in a case in which a sentence of death has been imposed."

Both of these sections took effect "July 1, 1994, and shall apply to sentences imposed on or after said date." An Act Concerning Methods to Expedite Review of Death Penalty Cases, ch. 262, sec. 5, § 16–12–101.5, 1994 Colo. Sess. Laws 1473, 1475. The crimes for which the jury convicted Harlan took place in February 1994 and his sentence was imposed in September 1995. The prosecution argues that the statutes apply because Harlan's sentence was imposed after their effective date.

Harlan responds that his crimes occurred before the General Assembly's adoption of the added appeal provisions. At the time of his crimes, there was no appeal provision for a post–conviction order invalidating a death sentence. *See* § 16–11–103(7)(b), 8A C.R.S. (Cum.Supp.1994)("If any death sentence imposed ... is held invalid ... [the] defendant shall be returned to the trial court and shall then be sentenced to life imprisonment."). Accordingly, argues Harlan, ex post facto constitutional principles prevent application of the later-enacted statute.

We need not resolve this dispute. In light of Harlan's contentions, there is a reasonable argument that the prosecution does not have an adequate alternative remedy. We agree with the prosecution that a trial court order vacating a jury-imposed death verdict is a matter of considerable public importance. Accordingly, we exercise original jurisdiction over this case under C.A.R. 21. *See Burchett*

*v. South Denver Windustrial Co.,* 42 P.3d 19, 20 (Colo.2002)("We exercise jurisdiction under C.A.R. 21 when a case 'raise[s] issues of significant public importance that we have not yet considered.' ")(internal citations omitted). We now turn to the rule of evidence that controls our analysis in this case.

## B. CRE 606(b)

■ Colorado Rule. of Evidence 606(b) strongly disfavors any juror testimony impeaching a verdict, even on grounds such as mistake, misunderstanding of the law or facts, failure to follow instructions, lack of unanimity, or application of the wrong legal standard. *See Hall v. Levine,* 104 P.3d 222, 225 (Colo.2005). This rule is designed to promote finality of verdicts, shield verdicts from impeachment, and protect jurors from harassment and coercion. *See Stewart v. Rice,* 47 P.3d 316, 322 (Colo.2002).

Nonetheless, CRE 606(b) allows juror testimony on the question of whether extraneous prejudicial information was improperly brought to the jurors' attention:

> Upon an inquiry into the validity of a verdict or indictment, a juror *may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent* from the verdict or indictment *or concerning his mental processes* in connection therewith, *except that a juror may, testify on the question whether extraneous prejudicial information was improperly brought to the jurors' attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may his affidavit or evidence. of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

CRE 606(b)(emphasis added).

■ Two applicable cases involving this exception are *Wiser v. People,* 732 P.2d 1139 (Colo.1987), and *People v. Wadle,* 97 P.3d 932 (Colo.2004). These cases establish a two-part inquiry: first, a court makes a determination that extraneous information was improperly before the jury; and second, based on an objective "typical juror" standard, makes a determination whether use of that extraneous information posed the reasonable possibility of prejudice to the defendant. Answering this inquiry presents a mixed question of law and fact. *Wadle,* 97 P.3d at 936–37. In these instances, we defer to the trial court's findings of historical fact if they are supported by competent evidence in the record, and we review the trial court's conclusions of law de novo. *People v. Matheny,* 46 P.3d 453, 461 (Colo.2002). .

■ As to the first part of the inquiry, *Wiser* and *Wadle* instruct that any information that is not properly received into evidence or included in the court's instructions is extraneous to the case and improper for juror consideration. In *Wiser,* we held it improper for a juror to consult a dictionary for a definition of "burglary," the crime with which the defendant was charged. 732 P.2d at 1141. We found use of the dictionary improper despite the fact that the trial court in that case had not specifically admonished the jurors against the use of a dictionary. Rather, we cited with approval cases holding that jurors are required to consider only the evidence admitted at trial and the law as given in the trial court's instructions, and that they must accept the court's legal definitions and obtain any needed clarifications from the trial judge, not from outside sources. *Id.* at 1141. On this basis, we held that the dictionary was extraneous information. and that its introduction and use to derive a definition not given by the trial judge was "improper" and amounted to "misconduct." *Id.* at 1141, 1143.

In *Wadle,* a juror searched the internet for a description of the anti-depressant drug Paxil and its medical uses and then shared the information with other jurors. This occurred after the jury had sent a note to the trial judge asking for a copy of the *Physician's Desk Reference* with which to look up the same information. The trial court refused the jurors' request, stating that reference materials of any kind are prohibited to jurors during their deliberations and referring them back to the instructions it had previously given. *Wadle,* 97 P.3d at 934.

There was no dispute in *Wadle* that the Paxil information was improper and the information was extraneous. Although the trial judge in *Wadle* indirectly admonished the jurors not to use outside reference materials during deliberations, we found that use of extraneous information may be improper *"whether or not* that exposure occurred as the result of *deliberate juror misconduct."* *Id.* at 935 (emphasis added). In this regard, we followed the rule of *Wiser* that a juror's action in obtaining and using extraneous information during deliberations is improper, even in the absence of a specific instruction forbidding use of that particular extraneous information.

■ Thus, our cases are clear that extraneous information is improper for juror consideration whether or not the court specifically warned against its use. This rule holds in cases where the extraneous information contains legal content, as did the definition of "burglary" in *Wiser*, and where it contains factual information, as did the internet description of Paxil in *Wadle*.

■ Court inquiry into the improper introduction of extraneous information must comply with the narrow exception of CRE 606(b). Under CRE 606(b), the historical fact-finding of the trial court must focus on the circumstances surrounding the jury's exposure to outside information or influences and the nature of the information or influences to which it has been exposed. *Wadle*, 97 P.3d at 935–36. The court may not take into account testimony regarding the jury's deliberations, a juror's mental processes leading to his or her decision, or whether the extraneous information actually swayed any of the particular jurors' votes. *See, e.g., id.* at 938 (stating that the "[t]rial court clearly misunderstood the import of the objective test" when it "not only permitted inquiry into jurors' discussions and mental processes; it clearly relied on the substance of those discussions and mental impressions in its determination that no prejudice resulted from the misconduct").

■ In *Wiser* and *Wadle*, we considered evidence from jurors regarding the source of the extraneous information, the manner of its acquisition, its content, and its presence and use in the jury room during deliberations. *See Wadle*, 97 P.3d at 937; *Wiser*, 732 P.2d at 1141. Evidence going to these facts is admissible under the CRE 606(b) exception for evidence regarding extraneous information improperly before the jury.

If the court's fact-finding, as guided by CRE 606(b), shows that jurors improperly considered extraneous information, a reversal of the verdict may be required if the defendant was prejudiced. *Wadle*, 97 P.3d at 935 (citing the "well-settled" proposition that exposure of a jury to information or influences outside of the trial process itself may require reversal of a criminal conviction even in the absence of deliberate misconduct); *see also Wiser*, 732 P.2d at 1141. In *Wiser*, we established the test for prejudice that comports with the limitations of CRE 606(b). We observed that CRE 606(b) precludes admission of the only evidence relevant to prove actual prejudice resulting from improper behavior by particular jurors; jurors cannot testify about the contents of their deliberations or their mental processes in reaching the verdict. *Wiser*, 732 P.2d at 1141.

Accordingly, we adopted an "objective test" for ascertaining "prejudice." The trial court must determine what influence the improperly introduced extraneous information might have had on a typical juror. This test recognizes that a reviewing court cannot consider evidence of actual impact on specific jurors in the case. The relevant question for determining prejudice is whether there is a reasonable possibility that the extraneous information influenced the verdict to the detriment of the defendant; if so, the verdict must be reversed. *Id.* at 1142; *see also, Wadle*, 97 P.3d at 937 ("[t]he dispositive question posed by the objective standard is simply whether there was a reasonable possibility that a typical juror . . . would have been influenced by [the extraneous] information").

In *Wiser*, we held that there was no reasonable possibility that the defendant was prejudiced by the jurors' use of the dictionary. We reasoned as follows. A juror had consulted the dictionary definition of "burglary," which referred to "theft." From this

definition, the juror could have easily but incorrectly concluded that theft is an element of burglary under Colorado law. Because the prosecution had not alleged or proved theft by the defendant, any influence the dictionary definition might have had on the jury would have been in the defendant's favor rather than to his detriment. *Id.* at 1143.

In contrast, in *Wadle* we upheld reversal of the defendant's conviction upon finding "at least a reasonable possibility that the extraneous information to which the jury was exposed influenced the verdict." 97 P.3d at 938. We reasoned that a typical juror could conclude from the extraneous Paxil information that the defendant was abnormally obsessive, compulsive, or given to panic. *Id.* at 937–38. The extraneous information was particularly material because evidence had been presented that the defendant took Paxil; and the prosecution alleged that the defendant had violently shaken her fussing four-month-old step-grandson, causing the injury that resulted in the infant's death.

█ *Wiser* and *Wadle* together considered several factors in determining whether improper introduction of the extraneous information into the jury room created a reasonable possibility that the jury's verdict was influenced to the detriment of the defendant. While these factors were not described as a formal test or an exhaustive list, we found them useful and persuasive in considering the issue of prejudice in those cases. Each of these factors is appropriate for inquiry under the CRE 606(b) exception: (1) how the extraneous information relates to critical issues in the case; (2) how authoritative is the source consulted; (3) whether a juror initiated the search for the extraneous information; (4) whether the information obtained by one juror was brought to the attention of another juror; (5) whether the information was presented before the jury reached a unanimous verdict; and (6) whether the information would be likely to influence a typical juror to the detriment of the defendant. *See Wadle,* 97 P.3d at 937; *Wiser,* 732 P.2d at 1143.

## C. Application to this Case

█ We must first determine whether the trial court's findings of fact are supported by evidence admissible under the CRE 606(b) exception for jury testimony relating to extraneous information, as explained in *Wiser* and *Wadle.* We do not consider any findings that are unsupported by the record or based on inadmissible evidence. The record of the Bible Motion hearing contains much testimony by jurors about the content of their deliberations and whether or not the Bible passages actually affected the verdict. Rule 606(b) prevents us from considering this testimony. Instead, we must apply the *Wadle* and *Wiser* "typical juror" legal standard, which focuses on the juror-introduced text and its possible prejudicial effect.

### 1. Trial Court's Findings of Fact— Extraneous Information Before the Jury

Evidence that jurors introduced and used Bibles, a Bible index, and hand-written notes on biblical passages in the jury room first surfaced during discussions with investigator Knapp in 1995. She spoke with five jurors who confirmed the consideration of such material before the jury reached its death verdict.

All twelve jurors testified at the Bible Motion hearing in 2003. As required by CRE 606(b), we limit ourselves to evidence and trial court findings that concern only whether extraneous prejudicial information was improperly brought to a juror's attention by another juror before the jury reached a verdict. *See Wadle,* 97 P.3d at 935–36. In addition, we may consider the nature of the extraneous information. *See id.*

The court found that several of the jurors researched the Bible for passages pertaining to the penalty for murder and shared them with other jurors:

[s]everal jurors researched and reviewed [B]ibles on Friday evening, June 30, 1995, to locate biblical passages pertaining to the penalty for murder. Some of the jurors wrote down the biblical passages they located so that they could take them to the jury deliberation room to share with other jurors on Saturday morning, July 1, 1995,

when the jury reconvened to continue their deliberations.

This finding considers facts that are permissible for inquiry under CRE 606(b), *Wadle*, and *Wiser* to show: (1) the source of the extraneous information; (2) that jurors initiated the search for the information; and (3) the content of the extraneous material.

The following testimony from juror Eaton–Ochoa at the Bible Motion hearing clearly shows that she studied from her Bible Friday night and wrote down information about the Leviticus and Romans passages:

Q. I'm going to read to you from 13:1 Romans, this Bible [belonging to Yantis–Cummings], all right?

. . . .

"Let every soul be subject to the governing authorities for there is no authority except from God and the authorities that exist are appointed by God." Does that sound more familiar to you?

A. Yes.

Q. Would that be one of the scriptures that you researched?

A. Yes.

. . . .

Q. Now, when you were researching in your Bible index, were you taking notes?

A. Yes.

. . . .

Q. Now, when you were researching, do you also specifically remember looking up a passage, "Eye for an eye, life for a life"?

A. Yes.

Q. And, "If you take a life, you shall be killed"?

A. Yes.

. . . .

Q. Now, I'm going to read to you from [Yantis–Cummings's] Bible. . . .

Your honor, Leviticus, Chapter 24:20.

"Fracture for fracture, eye for eye, tooth for tooth, as he has caused disfigurement of a man, so shall it be done to him." Does that sound familiar as one of the passages that you looked up?

A. There were several scriptures in the Bible that were similar and that's similar to what I was referring to, yes.

Q. All right.

And then it goes on 24:21: "And whoever kills an animal shall restore it, but whoever kills a man shall be put to death." Does that also sound familiar as one of the passages you looked up[?]

A. That's close to it, yes.

Q. And again, you researched and took notes of the passages you looked up?

A. I didn't take notes, I wrote addresses, which would be scripture reference.

Jurors Nowakowski, Yantis–Cummings, and Trujillo also testified at the hearing that they read from Bibles Friday night. Jurors Yantis–Cummings and Trujillo testified that they took notes from their Bibles.

Thus, the court's finding that "jurors researched and reviewed [B]ibles on Friday evening" and "wrote down biblical passages" is supported by competent evidence in the record.

The trial court also found that Bibles and notes concerning biblical passages were taken into the jury room on Saturday morning during the death penalty deliberations and were discussed prior to the death penalty verdict:

[j]urors took [B]ibles and notes with biblical passages concerning the penalty for murder into the jury deliberation room on Saturday morning, July 1, 1995. These materials were read and discussed among and between jurors prior to a verdict being reached.

The evidence supporting these findings is admissible under CRE 606(b) and the *Wiser* and *Wadle* standards to establish: (1) the presence of improperly introduced extraneous materials; (2) the content of the extraneous information; (3) whether the materials were used by jurors; and (4) whether they were used before the jury reached its verdict.

In making these findings, the trial court had to engage in difficult credibility determinations. The jurors' testimony was confused and contradictory. Jurors testifying in 2003 at the Bible Motion hearing had difficulty remembering events of 1995. Several who gave statements to investigator Knapp in 1995 contradicted those statements in 2003. Of course, we cannot second-guess determinations of the trial court regarding witness

credibility. *See People v. Pitts*, 13 P.3d 1218, 1221 (Colo.2000)("It is the function of the trial court, and not the reviewing court, to weigh evidence and determine the credibility of the witnesses."); *Wilson v. Bd. of County Comm'rs*, 703 P.2d 1257, 1259 (Colo. 1985)("[I]t is not the province of this court to judge the weight of the evidence or the credibility of the witnesses.").

In the 1995 interviews, conducted three months after the trial, jurors Eaton–Ochoa, Nowakowski, Wright, Trujillo, and Salter mentioned that they saw, brought, or might have seen Bibles, a Bible index, or notes on biblical passages in the jury room during deliberations Saturday morning before the jury reached the death verdict. At the 2003 hearing, Wright and Salter denied or expressed doubt about these prior statements.

But juror Eaton–Ochoa stated in both 1995 and 2003 that she brought a Bible and notes of Bible passages into the jury room. Juror Nowakowski told investigator Knapp that she saw a Bible containing a study index in the room and did not contradict that statement at the hearing. Juror Eaton–Ochoa stated that she used a Bible to show the Leviticus and Romans passages to juror Cordova on Saturday morning in the jury room:

Q. Do you remember telling Ms. Raelee Knapp ... that one of the passages you specifically remember researching ... [was] 'I will use you as a tool and if a man takes a man's life, then his life should be taken.'

A. Okay, I don't think that that was one scripture, I think that was the two scriptures that we've already referenced [Leviticus 24:20-21 and Romans 13:1], put together.

. . . .

Q. When you resumed your deliberations the following morning, did you bring a Bible into the deliberation room with you?

A. Yes, I did.

Q. For what purpose?

A. To show Jesus [Cordova] the scriptures I had looked up.

. . . .

Q. Was Jesus—did you show that to Jesus before a decision was made?

A. Yes.

In addition to this evidence, juror Cordova stated there was no Bible present during deliberations and no discussion of biblical passages. However, he also stated, erroneously, that the trial court had told the jurors not to bring in Bibles or discuss verses. In addition, he testified that the jurors considered no evidentiary exhibits during their deliberations and that he did not have a roommate during sequestration at the hotel, all of which is contradicted by the record. The testimony of three witnesses impeached all or portions of juror Cordova's 2003 testimony.

Two other jurors, Smith and Taylor, denied the presence of Bibles or discussion of verses. Both stated that someone mentioned biblical information in the jury room Saturday morning, but Smith cut the person off because the discussion was inappropriate. No other juror corroborated this statement.

The trial court noted that some jurors "appeared defensive and at times resentful" about testifying at the hearing, that "the significant lapse of time since the trial had taken a toll on their abilities to recall," and that some jurors granted interviews in 1995 and "[o]thers refused." The court found "[a]ll of these circumstances ... of considerable importance and significantly weighty in assessing the credibility of the witnesses." The court properly made its determinations on credibility, *see Pitts*, 13 P.3d at 1221, and its finding is supported by competent evidence. Accordingly, we will not second-guess the court's credibility determinations.

Finally, the trial court found that the jurors were exposed in the jury room to passages relating a biblical command for imposition of the death penalty before the verdict was reached.

*[j]urors were exposed to [B]ibles and [B]ible passages concerning God's view on punishment for murder while they were sequestered during their deliberations on the penalty phase of the Defendant's trial.* This occurred when they took the evening recess on Friday, June 30, 1995 and when they resumed their deliberation on Saturday, July 1, 1995. *The biblical passages were read and discussed in the jury room. This occurred prior to the jury reaching a unanimous verdict.* The credible evidence does not indicate that jurors were at a particular step in the four step process.

*What is certain is that a verdict imposing the death sentence had not been reached at the time the extraneous materials were considered.*

(emphasis added).

This finding is also supported by evidence that is permissible under CRE 606(b), *Wiser,* and *Wadle* to show: (1) the nature of the extraneous information considered; and (2) during which phase of deliberations it was presented.

Perhaps the most telling evidence of extraneous materials again came from juror Eaton–Ochoa. Her testimony was clear that she showed the Leviticus and Romans passages to juror Cordova Saturday morning before the jury reached its death penalty verdict.

Because they are supported by evidence in the record admissible under CRE 606(b), we defer to the trial court's findings of fact that jurors, without authorization from the trial court: (1) researched Bible verses and took notes on them on Friday night; (2) brought one or more Bibles, a Bible index, and notes on certain biblical passages into the jury room during sentence phase deliberations on Saturday morning; and (3) shared in the jury room an authoritative passage commanding the imposition of the death penalty for murder before they reached their verdict imposing the death penalty on Harlan.

We now turn to our legal conclusions based on this evidence and these findings.

## 2. Conclusions of Law

Our inquiry involves the same two-step process guiding the trial court: whether extraneous information was improperly before the jury and whether use of that information could have influenced the verdict to Harlan's detriment.

### a. The Extraneous Information was Improperly Introduced into Consideration

■ The trial court properly found that one or more jurors introduced one or more Bibles, a Bible index, and notes of Bible passages into the jury room for consideration by other jurors. The trial court had not admitted these materials into evidence, nor did the court's instructions allow their use.

Accordingly, these materials were extraneous and their introduction was improper and constituted misconduct.

CRE 606(b) and the standards of *Wiser* and *Wadle* do not require a trial court order prohibiting use of particular material before that material may be found to be extraneous and improperly before the jury. The information is improper and its introduction by one juror for consideration by another prior to the verdict constitutes juror misconduct as long as the trial court has delivered standard instructions limiting the jury's consideration to admitted evidence and the court's legal instructions. *See Wiser,* 732 P.2d at 1141. The court's instructions in this case were sufficient to admonish the jury that they could only consider the evidence and law presented during the trial.

Exposure of a jury to information or influences outside of the trial process itself may require reversal of a criminal conviction "whether or not that exposure occurred as the result of deliberate juror misconduct." *Wadle,* 97 P.3d at 935. Because the trial court's admonitions were thorough and sufficient to instruct a capital sentencing jury, and because the written biblical materials used in the jury room were neither admitted into evidence nor permitted by court instruction, their use in this case was improper.

### b. Prejudice Inquiry

■ Turning now to the prejudice examination required by *Wiser* and *Wadle,* we conclude that there is a reasonable possibility that the Bible material introduced into the jury room would have influenced a typical juror to vote for the death penalty instead of a life sentence, to Harlan's obvious detriment.

Under the state's two-phase jury process in cases where the prosecution seeks the death penalty, the jury may be called upon to reach two verdicts. First, the jury determines whether the defendant is guilty beyond a reasonable doubt of first degree murder. This verdict must be unanimous. Second, employing the four-step process as instructed by the trial court, the jury determines whether to impose life imprisonment

or death. *See People v. Dunlap*, 975 P.2d 723, 736 (Colo.1999). Colorado has tailored its four-step death penalty process to center on the proposition that any individual juror may ultimately trigger life imprisonment by not agreeing to a death penalty verdict.

The first three steps are: (1) the prosecution must prove beyond a reasonable doubt that at least one aggravating factor exists; (2) each juror must consider whether any mitigating factors exist; and (3) the jury must unanimously decide whether any mitigating evidence outweighs the aggravating factors. *See Woldt v. People*, 64 P.3d 256, 264 (Colo.2003); *Dunlap*, 975 P.2d at 736. Only if the jury finds that the mitigating evidence is outweighed by aggravating factors does it proceed to the fourth step. *Dunlap*, 975 P.2d at 736.

In order to impose the death penalty, during the fourth step the jury must find that it is convinced beyond a reasonable doubt that death is the appropriate sentence, its verdict must be unanimous, and its imposition of the death penalty must not be influenced by passion, prejudice, or any other arbitrary factor. *See Harlan*, 8 P.3d at 499; *Dunlap*, 975 P.2d at 736; *see also Woldt*, 64 P.3d at 264 ("Colorado's fourth step requires the trier of fact to consider all *relevant* evidence.")(emphasis added). In reaching its ultimate verdict, the jury may consider all the evidence introduced at trial, as well as the defendant's statement in allocution. Any one juror, by holding out against a unanimous verdict of death, can require imposition of life imprisonment without parole. *See Woldt*, 64 P.3d at 264.

Both *Wiser* and *Wadle* address jury verdicts in the guilt phase of criminal trials. Of course, it is only the unusual criminal case in which the jury is called upon to reach a second verdict, such as in the unique circumstances in which a jury might impose the death penalty. The *Wiser* and *Wadle* precedent is especially appropriate in a capital case, where the extraneous information improperly introduced into consideration may influence a typical juror to vote for a death sentence instead of voting for life imprisonment without parole.

We now consider the same prejudice factors we considered in the *Wiser* and *Wadle* analyses.

First, we consider how the extraneous information related to critical issues in the case. Here, the written biblical material was directly related to the ultimate issue for jury determination, a sentence of life or death.

Second, we consider the degree of authority represented by the extraneous information. In *Wadle* we found that scientific information from the internet would be considered authoritative by typical lay jurors. 97 P.3d at 937–38.

The Bible and other religious documents are considered codes of law by many in the contemporary communities from which Colorado jurors are drawn. The book of Leviticus is one of the first five books of the Old Testament, which are considered the books of law, and it contains "ritual laws prescribed for the priests" and is "almost entirely legislative in character." *Holy Bible* (Papal Edition), "Introduction to the Books of the Old Testament" at xiii. Romans is contained in the New Testament and may be characterized as "a powerful exposition of the doctrine of the supremacy of Christ and of faith in him as the source of salvation." *Id.*, "Introduction to the Books of the New Testament" at xxxix. There can be little doubt that the Bible, including these two texts, is more authoritative to many typical citizens than the internet. *See Jones v. Kemp*, 706 F.Supp. 1534, 1560 (N.D.Ga.1989)(considering jurors' consultation of a Bible and holding that "[e]specially when, as here, such arguments come from a source which 'would likely carry weight with laymen and influence their decision,' the effect may be highly prejudicial to the defendant")(internal citations omitted).

Third, we consider how the information was acquired. Without authorization from the trial court, one or more jurors independently researched the extraneous written biblical material for presentation to other jurors.

Fourth, we consider whether the information was shared with other jurors in the jury room. It was. Juror Eaton–Ochoa showed the passages to juror Cordova, and the dis-

cussion of the texts possibly included other jurors.

Fifth, we consider whether the information was considered before the jury reached its verdict. After hearing admissible testimony and making its credibility determinations, the trial court found that jurors considered the Leviticus and Romans passages before they reached their death penalty verdict. Reviewing the evidence, the court found that it could not determine at what step in the four-step deliberation process jurors considered the Bible texts. In any event, *Wiser* and *Wadle* require only that the improper, extraneous information is considered before the jury reaches its verdict and there is a reasonable possibility that it influenced the verdict to the detriment of the defendant.

Finally, we consider whether there is a reasonable possibility that the Leviticus and Romans passages would influence a typical juror to Harlan's detriment in this death penalty proceeding. The question here is not whether the jury's verdict actually turned upon consideration of the Bible texts, but whether a typical Colorado juror would be influenced to vote for the death penalty by biblical text introduced into the jury room without authorization.

The Leviticus text is written in the first person voice of God and commands death as the punishment for murder. The Romans text instructs human beings to obey the civil government. Here, the State of Colorado was seeking the death penalty. If the jury was unable to reach a unanimous verdict of death, the trial court would have been required to impose a life sentence without the possibility of parole. Drawn from an array of typical jurors in Colorado, at least one juror in this case could have been influenced by these authoritative passages to vote for the death penalty when he or she may otherwise have voted for a life sentence. All the indicia of prejudice considered by *Wiser* and *Wadle* for reversal of jury verdicts are more than met here.

In *Dunlap*, we cited with approval the United States Supreme Court's admonition that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Dunlap*, 975 P.2d at 763 (*quoting Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)). The *Caldwell* Court was referring to a prosecutor's argument that the jury need not be concerned about imposing the death sentence because it would be automatically appealed to the state supreme court.

How much more persuasive to a typical juror, then, is a biblical text relieving the juror from his or her individual responsibility to determine whether to commit a person to death because God commands that result? A religious text mandating the death penalty meets the *Wiser* and *Wadle* standard of extraneous information creating a reasonable possibility that a typical juror would be influenced in voting on the verdict.

In so holding, we do not suggest that the jurors who served in this case were unable to distinguish between religious and state law. Neither do we hold that consideration of the text actually produced the death penalty verdict. To the contrary, CRE 606(b) prevents us from considering any juror testimony that addresses the jury's deliberations or a juror's thought process. Our legal analysis here is far from an inquiry that emphasizes the form of the religious texts considered here over their substance. Rather, our jurisprudence has developed the *Wiser* and *Wadle* objective typical juror test for ascertaining prejudice as a means to prevent invasion of the jury's deliberative process while protecting the defendant's right to a verdict untainted by extraneous prejudicial texts. We conclude that introduction of the Bible by a juror to demonstrate to another juror a command of death for murder created a reasonable possibility that a typical juror would have been influenced to vote for a death sentence instead of life; consequently, we must uphold the trial court's judgment vacating the death sentence and sentencing Harlan to life imprisonment without parole.[5]

---

5.  Several courts in other jurisdictions have considered the possibility of prejudice arising from jury consideration of biblical information during deliberations. Some courts have found that prej-

We do not hold that an individual juror may not rely on and discuss with the other jurors during deliberation his or her religious upbringing, education, and beliefs in making the extremely difficult "reasoned judgment" and "moral decision" he or she is called upon to make in the fourth step of the penalty phase under Colorado law. We hold only that it was improper for a juror to bring the Bible into the jury room to share with other jurors the written Leviticus and Romans texts during deliberations; the texts had not been admitted into evidence or allowed pursuant to the trial court's instructions.

We expect jurors to bring their backgrounds and beliefs to bear on their deliberations but to give ultimate consideration only to the facts admitted and the law as instructed. The judicial system works very hard to emphasize the rarified, solemn and sequestered nature of jury deliberations; jurors must deliberate in that atmosphere without the aid or distraction of extraneous texts that could prejudicially influence the verdict.

The written word persuasively conveys the authentic ring of reliable authority in a way the recollected spoken word does not. Some jurors may view biblical texts like the Leviticus passage at issue here as a factual representation of God's will. The text may also be viewed as a legal instruction, issuing from God, requiring a particular and mandatory punishment for murder. Such a "fact" is not one presented in evidence in this case and such a "legal instruction" is not the law of the state or part of the court's instructions.

From 1861 until 1901, the law of Colorado did impose a mandatory death sentence for those who committed first degree murder. *See, e.g.*, Act of Nov. 5, 1861, div. IV, § 20, 1861 Colo. Terr. Sess. Laws 290, 292–93 ("The punishment of any person or persons of the crime of murder shall be death."). In 1901, reinstating capital punishment after a four-year period during which it was abolished, the General Assembly introduced jury discretion in choosing a life sentence or the death sentence when a defendant was convicted of first degree murder. Act of May 2, 1901, ch. 64, Sec. 2, § 1176, 1901 Colo. Sess. Laws 153, 154 ("if murder of the first degree,

---

udice did arise or would have arisen from the use of Bibles during deliberation. *See, e.g., Jones v. Kemp*, 706 F.Supp. 1534, 1560 (N.D.Ga.1989)(habeas corpus petition granted in part because trial court permitted jurors to bring Bibles into deliberations); *Grooms v. Commonwealth*, 756 S.W.2d 131, 145 (Ky.1988)(Stephens, C.J., concurring)(stating that majority should have included "existence and use of a Bible during the deliberations" during death penalty phase as additional grounds for reversal); *State v. Franklin*, No. 19041, 2002 WL 1000415, *12 (Ohio App.2002)(where Bible was not actually present in jury room but verses were cited, claim dismissed absent evidence that this "had any effect on the jury"); *Glossip v. State*, 29 P.3d 597, 605 (Okla.Crim.App.2001)(reversing on other grounds and noting that jury's use of Bible during deliberations "may have an improper influence upon the ... verdict"); *State v. Harrington*, 627 S.W.2d 345, 350 (Tenn.1981)(where case reversed on other grounds, jury foreman reading from Bible to support argument for death penalty "of course[ ] was error which would have required a new sentencing hearing"); *Lenz v. Warden of the Sussex I State Prison*, 267 Va. 318, 593 S.E.2d 292, 300 (2004)(presumption of prejudice only applicable where petitioner shows "evidence that the jury consulted, read aloud or discussed ... Bible passage[s]").

Other courts have found no possibility of prejudice requiring reversal under the particular facts of the case. *See, e.g., Burch v. Corcoran*, 273 F.3d 577, 591 (4th Cir.2001)(upholding trial court's finding of fact that juror carrying Bible, reciting verses and reading from Bible during deliberations was probably not improper communication and, if so, there was "no reasonable possibility that the jury verdict was influenced"); *McNair v. State*, 706 So.2d 828, 838 (Ala.Crim. App.1997) no prejudice where selections from Psalm 121, ("my help cometh from the Lord," and Luke, ("[j]udge not and ye shall not be judged ... forgive and ye shall be forgiven," were "intended to encourage, and had the effect of encouraging, the jurors to take their obligation seriously and decide the question ... based only on the evidence presented"); *People v. Mincey*, 2 Cal.4th 408, 6 Cal.Rptr.2d 822, 827 P.2d 388, 425 (Cal.1992)(no prejudice where trial court discovered that jury read Bible after day's deliberations were over and admonished them from any further consideration of Bible); *Jones v. Francis*, 252 Ga. 60, 312 S.E.2d 300, 303 (Ga. 1984)(no prejudice against defendant where Bible was not secreted into jury room and no "extraneous influence" came to bear on jurors); *Bieghler v. State*, 690 N.E.2d 188, 203 (Ind. 1997)(no prejudice where juror evidence showed that Bible was not consulted as an extra-legal source of authority during deliberations); *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139, 205 (Kan. 2001)(no recall of jury required where juror affidavit gave no evidence that biblical material played a "major role" in verdict).

the jury shall in its verdict fix the penalty to be suffered by the person so convicted, either at imprisonment for life at hard labor in the penitentiary, or at death").

In 1994, when Harlan killed Rhonda Maloney and shot Jaquie Creazzo, the law of Colorado provided that a jury must determine whether a defendant convicted of first degree murder must be sentenced to life or death according to a very specific and discrete decision-making process, which was the process the jury was charged to use in this case. *See* § 16–11–103(2)(a),(b) 8A C.R.S. (Cum.Supp.1994)(providing for the four-step jury deliberation process outlined above); *Woldt*, 64 P.3d at 264. Not only does the law provide for jury discretion on this matter, but it allows for a single juror to cause the imposition of a life sentence if he or she does not agree that the death sentence is required. *See Dunlap*, 975 P.2d at 736.

In a community where "Holy Scripture" has factual and legal import for many citizens and the actual text introduced into the deliberations without authorization by the trial court plainly instructs mandatory imposition of the death penalty, contrary to state law, its use in the jury room prior to the penalty phase verdict was prejudicial to Harlan. Our analysis of the six factors for prejudice, in the context of a death penalty verdict, leads us to conclude that there is a reasonable possibility that the extraneous biblical texts influenced the verdict to Harlan's detriment. *See Wiser*, 732 P.2d at 1142.

### D. Prosecution's Invited Error Argument

■ The prosecution contends that the defense opened the door to juror use of the Bible materials in the jury room. We reject this contention. First, *Wiser* and *Wadle* are clear that consideration of extraneous materials during deliberations is itself improper because they are not part of the trial process. Second, defense counsel's argument did not invite the jurors to research the Bible's position on capital punishment. Rather, defense counsel was making a legitimate plea for mercy. In closing, she analogized the relationship between Harlan and his father to the story of Abraham and Isaac in the Old Testament.

Evidence had been presented that, during police investigation of the crime, Harlan's father found incriminating evidence against his son and turned it over to the police. Defense counsel suggested that, like Abraham, Harlan's father loved his son very much, yet chose to take an action that threatened his son's safety because it was the right thing to do. As God ultimately took mercy on Abraham, defense counsel argued that the jury should be merciful to Harlan and his father and let the son live. Defense counsel also made several references to Harlan's soul and to his habit of reading the Bible with his father.

Defense counsel did not exceed the bounds of a mitigation argument. Had the prosecution believed that any part of this argument opened the way to the jury's use of biblical texts in the jury room, it could have asked the trial court to allow their introduction and use. Surely, if this request had been made, the trial court would have limited the prosecution to, at most, a suitable responsive argument to the jury. *See Jones v. Francis*, 252 Ga. 60, 312 S.E.2d 300, 303 (1984)(in closing of penalty phase, defense counsel traced at length the changes in approach to punishment between the Old Testament and the New Testament, but it was still error to allow jurors to take Bible into jury room); *cf. Kemp*, 706 F.Supp. at 1560 (finding error where trial court agreed to jurors' request to take Bibles into jury room). Using biblical allusions in closing argument does not invite unauthorized introduction of Bible texts into the jury room.

### E. Our Duty of Independent Review for Passion, Prejudice, or Other Arbitrary Factors

■ As discussed above, we uphold the trial court's judgment vacating Harlan's death sentence based on the precedent and standards of *Wiser* and *Wadle*. In addition, with the evidence presented at the Bible Motion hearing, we must revisit that part of our earlier opinion that found that the imposition of Harlan's death sentence was not influenced by passion, prejudice, or other arbitrary factors.

If we determine that a death sentence was imposed under the influence of passion, prejudice, or other arbitrary factors, we must set it aside. § 16–11–103(7)(b), 8A C.R.S. (Cum. Supp.1994)("If any death sentence imposed

... is held invalid ... [the] defendant shall be returned to the trial court and shall then be sentenced to life imprisonment."); *Dunlap*, 975 P.2d at 764.

In *Harlan*, we considered the possible influence of racial bias on the death sentence verdict and found no evidence of a sentence imposed under the influence of passion, prejudice, or other arbitrary factors in the form of racial animosity. 8 P.3d at 499–501. Based on the trial court's findings and competent evidence of jurors' use of the Bible during deliberations, we do not have confidence that the death penalty here was not influenced by extraneous information. *See id.* Contrary to our prior finding, we determine that Harlan's death sentence may have been imposed under the influence of passion, prejudice, or other arbitrary factors—the use of an unauthorized extraneous text requiring the death penalty for the crime of murder. This is an additional basis for our decision upholding the trial court's imposition of a sentence to life imprisonment without parole.

## III.

Accordingly, we uphold the trial court's judgment vacating the death sentence and imposing upon Harlan a life sentence without the possibility of parole, and we discharge the rule.

Justice RICE dissents and Justice KOURLIS joins in the dissent.

Justice BENDER and Justice COATS do not participate.

RICE, J., dissenting.

In an opinion that elevates form over substance, the majority holds that because some members of the jury read from a Bible during the course of deliberations, the death verdict must be set aside. I respectfully disagree.

Since inquiry into the jury's deliberations is prohibited except to determine whether extraneous prejudicial information was improperly brought to the jurors' attention, CRE 606(b), we would ordinarily assess the impact of the extraneous information by considering its likely impact on a "typical" jury. *See, e.g., People v. Wadle*, 97 P.3d 932, 935 (Colo.2004). However, in this case, each of the twelve jurors testified not only about whether extraneous information was brought into the jury room, but also about what impact, if any, the presence of a Bible in the jury room had on those deliberations. As a result, there is no need to assess the impact of the biblical passages on a "typical" jury.[1] Rather, we know from the sworn testimony of the jurors themselves that not even one of the jurors was influenced by these biblical passages to vote for the death penalty, and thus, the biblical passages were not prejudicial to Harlan. Even so, I also am certain that there is no reasonable possibility that a typical jury would be prejudiced by exposure to the biblical passages at issue here.

Accordingly, because I believe the passages read by the jurors, although extraneous, were not prejudicial to Harlan, and did not affect the verdict in this case, I would reverse the trial court and reinstate the death penalty.

## I. Facts

As an initial matter, I take exception to the facts set forth by the majority. First, there was no juror misconduct in this case. Although the jurors were advised of many things which they could not do during the

---

1. As recognized in *Wiser v. People*, the impact upon a typical juror is a legal fiction, a judicially-created artifice intended to provide a structured inquiry of typicality where CRE 606(b) would restrict analysis of prejudice to mere speculation. *See* 732 P.2d 1139, 1141–42 (Colo.1987) ("The problem with both the requirement that the defendant demonstrate actual prejudice and the rebuttable presumption of prejudice approach is the difficulty, once a verdict has been reached, in obtaining evidence of actual prejudice or evidence with which to rebut the presumption because of the longstanding rule proscribing evidence concerning the mental processes of jurors."). However, in this case, whether proper or not, the trial judge held a five-day hearing during which all twelve jurors testified about the deliberations. As a result, it makes no jurisprudential sense to utilize an artificial legal device in order to assess the prejudicial impact of the biblical passages upon the jury's verdict. Indeed, since we know from the record that the extraneous evidence was not actually prejudicial to Harlan, the majority's insistence on reversing Harlan's death sentence by finding a reasonable probability of prejudice with reference to a "typical" jury is unwarranted.

course of their deliberations,[2] the jurors were never told to refrain from consulting the Bible or other religious material.[3] As such, the conduct of jurors in this case is completely unlike that of the jurors in either *Wadle* or *Wiser*.

Specifically, both *Wiser* and *Wadle* involved violations of explicit court orders. In *Wiser*, 732 P.2d at 1141, we held that a juror's resort to a dictionary for a further definition of burglary after having been instructed as to the legal meaning of the term was misconduct. Likewise, in *Wadle*, 97 P.3d at 934, during deliberations, the jury sent a note to the court, asking why a doctor would prescribe Paxil instead of a different anti-depressant, and requested a copy of the *Physician's Desk Reference*. The court responded that supplying reference materials of any kind to a jury was prohibited, and it referred the jury back to its instructions. *Wadle*, 97 P.3d at 934. Despite this, a juror obtained information from the internet about the drug in question and shared that information with the other jurors. *Id.* We held this behavior to be juror misconduct. *Id.* at 937.

Second, and contrary to the trial judge's findings,[4] this is not a case where the use of extraneous information was extensive or widespread. The trial court greatly overstated both the nature of the extraneous information and the jurors' use of that information, making conclusions from these over-

stated facts which are simply not supported by the record.

For example, the trial court concluded that juror Ochoa "read and wrote down the cite to *Romans* 13:1, which requires that one look at government authorities as God's representative on earth and follow their lead as agents of 'wrath to bring punishment to the wrongdoer.'" The trial court's reference to the phrase 'wrath to bring punishment to the wrongdoer,' however, finds absolutely no support in the record. While it is correct that juror Ochoa referred to *Romans* 13:1, that passage merely states "Let every soul be subject to the governing authorities for there is no authority except from God and the authorities that exist are appointed by God." The phrase the trial court cited actually comes from *Romans* 13:4, not *Romans* 13:1. *Romans* 13:4 was not brought out in sworn testimony or in any prior statements, so there was never any indication that any juror even looked at it, much less considered it.[5] The majority makes no attempt to correct these overstatements.

In addition, the trial court improperly made credibility findings against some of the jurors based on their refusal to talk to the defendant's investigator. The trial court found that the testimony of jurors Yantis–Cummings, Dockter, Elizalde, Smith, and Taylor, all of whom testified that they either did not recall seeing a Bible or were sure that they had not seen a Bible in the jury

---

**2.** The record reflects that the jurors were told not to discuss the case with anyone, not to watch anything about the case on television, not to read anything about the case in the newspapers, and not to read anything about the criminal justice system as a whole in the newspapers. In addition, the jurors were told to base their "decision only on the evidence that you get at trial, nothing else whatsoever."

**3.** The absence of such an instruction is curious as the record is replete with biblical references. For example, during voir dire proceedings, defense counsel specifically asked juror Cordova about the concept of "an eye for an eye," thus provoking discussion about one of the very Bible passages to which the majority now takes exception. In addition, during trial, Harlan's father testified that "God never gave up on a living man, I won't either" and that "God gave life and only God can take it." During his closing argument, defense counsel repeatedly referenced the

Bible, telling the story of Abraham and Isaac and making several references to Harlan's soul and to his habit of reading the Bible. Even Harlan himself mentioned talks with his father concerning "sports, family and the Bible" in his statement of allocution.

**4.** We defer to the trial court's findings unless they are so clearly erroneous as to not find support in the record. *See, e.g., People v. Schrader*, 898 P.2d 33, 36 (Colo.1995). "A finding is clearly erroneous, and, therefore, lacking support of competent evidence, when 'although there [may be] evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Quintana v. City of Westminster*, 56 P.3d 1193, 1196 (Colo.App.2002) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

**5.** For another example, see *infra* note 9.

deliberation room, was not credible or persuasive because these jurors had refused to grant interviews to the defense investigator after the trial. This inference is absolutely improper.

Courts are required to instruct jurors upon their discharge that it is entirely the jurors' decision whether to talk to anyone about the case or their service as a juror. *See* CJI–Crim. 1:06. In addition, the very purpose of CRE 606(b) is to protect jurors from unwelcome and unnecessary contact by either party after the jurors have rendered a verdict. *Stewart v. Rice*, 47 P.3d 316, 322 (Colo.2002). As such, a juror's reluctance to talk to, much less grant an interview to an investigator employed by counsel cannot be used to discredit his or her subsequent sworn testimony.

In short, a thorough review of the record supports the following conclusions: 1) some jurors read personal or hotel Bibles during the recess from deliberations on Friday evening, focusing on *Romans* 13:1, as well as *Leviticus* 24:20–21 and other passages similar to "an eye for an eye";[6] 2) one juror brought a Bible into the jury deliberation room on Saturday; 3) that same juror showed another juror the written *Romans* 13:1 passage and passages similar to "an eye for an eye"; 4) there was very limited discussion of the *Romans* 13:1 passage and passages similar to "an eye for an eye" in the jury room; and 5) any biblical discussions that occurred took up a proportionally small amount of time during deliberations and were not for the purpose of convincing a member of the jury to vote for the death penalty.[7]

## II. Legal Analysis

I now address whether the jurors were exposed to extraneous prejudicial informa-

tion in the form of biblical passages. It is important to note that the concept of "extraneous information" does not include the general knowledge a juror brings to court. *See Destination Travel, Inc. v. McElhanon*, 799 P.2d 454, 456 (Colo.App.1990). To the contrary, we expect jurors in death penalty cases to rely not only on their life experiences, but also on their moral judgments. *See People v. Martinez*, 970 P.2d 469, 477 (Colo.1998) ("Quite simply, a capital sentencing hearing is qualitatively different from any other kind of sentencing proceeding: only in a capital case is the death penalty an issue.").

Rather, "extraneous information" generally refers to facts about the case which were not admitted into evidence. *See McElhanon*, 799 P.2d at 456. In this case, jurors were exposed to two specific biblical passages in the jury room, *Romans* 13:1 and *Leviticus* 24:20–21. Since these written biblical passages were not admitted into evidence as facts, they are by definition "extraneous information."

Thus, contrary to what the majority states,[8] the only issue is whether the jury's exposure to this specific information was prejudicial to Harlan. For the reasons discussed below, I conclude that there is no reasonable possibility that exposure to written versions of *Romans* 13:1 and *Leviticus* 24:20–21 was prejudicial to Harlan.

### A. The Biblical Passages Referenced Here Were Not Prejudicial to Harlan

The jurors' exposure to *Romans* 13:1 and *Leviticus* 24:20–21 was not prejudicial to Harlan because the jurors were required to make an overwhelming moral decision, namely whether the death penalty was an appropriate punishment for Harlan. To this end,

---

6. The majority does not hold that it is error for the jurors to read the Bible in the privacy of their hotel rooms, and I agree with that.

7. Juror Eaton–Ochoa testified that she showed juror Cordova the Bible to show him that "[t]he Bible says obey the laws of the land."

8. Based on its interpretation of *Wiser* and *Wadle*, the majority sets forth six factors to consider

when analyzing the effect of extraneous information on a jury. Maj. op. at 626. However, neither *Wiser* nor *Wadle* support this kind of categorical approach when undertaking an analysis of extraneous information. Rather, the sole inquiry upon which each case focuses is whether there is a reasonable possibility that exposure to extraneous information prejudiced the defendant. *See Wadle*, 97 P.3d at 935; *Wiser*, 732 P.2d at 1142.

the court instructed the jurors to "apply [their] *reasoned judgment* in deciding whether the situation calls for life imprisonment or the imposition of the death penalty" (emphasis added). The court further told the jurors that "you must still all make a further *individual moral assessment* of whether you have been convinced beyond a reasonable doubt that the death penalty, instead of life in prison, is the appropriate punishment for [Harlan] in this case" (emphasis added). As such, the jury instructions squarely directed the jurors to consider their moral and religious precepts, as well as their general knowledge, when making a reasoned judgment about whether or not to impose the death penalty.

The biblical passages at issue here constituted either a part of the jurors' moral and religious precepts or their general knowledge, and therefore were relevant to the jurors' court-sanctioned individual moral assessment. For example, *Romans* 13:1 states that "[e]veryone must submit himself to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God." Contrary to what the trial court states,[9] the plain meaning and well-accepted interpretation of this passage is that individuals are to obey the laws of their nation. *See* Matthew Henry, *Commentary on the Whole Bible* 2227 (Hendrickson Publishers 1991) (1721). Thus, in effect, this passage instructs individuals to follow the laws of Colorado. The laws of Colorado do not mandate the death penalty, but rather provide a four-step process that guides jurors in reaching a decision on sentencing in capital cases. *See* maj. op. at 630.

Here, it is undisputed that the trial court properly instructed the jury to follow this four-step process at the close of the sentencing hearing. Likewise, the prosecution and defense counsel instructed the jurors to adhere to this four-step process. There is no reasonable possibility that the jurors' exposure to a biblical passage instructing them to follow Colorado law was prejudicial to Harlan.

Similarly, exposure to *Leviticus* 24:20–21, or similar passages, also was not prejudicial to Harlan. *Leviticus* 24:20–21 provides that "fracture for fracture, eye for eye, tooth for tooth. As he has injured the other, so he is to be injured. Whoever kills an animal must make restitution, but whoever kills a man must be put to death."

The concept of "an eye for an eye" is more than a biblical passage; it is a cultural precept in contemporary society that has origins predating the Bible. *See Code of Hammurabi* § 196 (Robert Francis Harper ed. & trans., Univ. of Chicago Press 2d. ed.1904) (about 1750 B.C.). Religious and non-religious individuals alike are familiar with the phrase and its meaning as part of their general knowledge. Moreover, not all religious individuals subscribe to the "eye for an eye" mentality, as evidenced by juror Cordova's testimony on voir dire. When asked whether he ascribed to the idea of an eye for an eye, juror Cordova replied, "No, I can't." Rather, juror Cordova stated that his philosophy, which had been shaped by his readings of the Bible, was "to be as fair as I can in everything that I do."

In sum, the jurors were entitled to rely on their own moral and religious precepts, as well as their general knowledge, in making their moral decision whether the death penalty was an appropriate punishment. The biblical passages the jurors discussed constituted either a part of the jurors' moral and religious precepts or their general knowledge, and thus were relevant to their court-sanctioned individual moral assessment. Accordingly, and as the record clearly shows, the extraneous evidence did not actually prejudice the jury's verdict. In addition, it is equally certain that there is no reasonable possibility a typical jury would have been influenced. Therefore, Harlan was not prejudiced.

---

9. The trial court held that *Romans* 13:1 "plainly instructs mandatory imposition of the death penalty contrary to state law."

## B. The Biblical Passages Referenced Here were Not Used As An Extra-Judicial Code.

The majority apparently agrees that these passages are not prejudicial, at least to the extent that the biblical passages are spoken or remembered. Recognizing that the Bible informs the "reasoned judgment" and "individual moral assessment" of many in communities from which Colorado jurors are drawn, the majority concedes that each individual juror may rely on, "and discuss with the other jurors during deliberation his or her religious upbringing, education, and beliefs in making the extremely difficult 'reasoned judgment' and 'moral decision'" jurors are called upon to make in imposing the death penalty. Maj. op. at 632.

Nevertheless, the majority concludes that this otherwise proper information, i.e., the discussion of generally known biblical passages, somehow becomes an extra-judicial code that supplants Colorado law when presented in written form, stating the "written word persuasively conveys the authentic ring of reliable authority in a way the recollected spoken word does not." Maj. op. at 632.

However, by choosing to define the written version of these commonly known biblical passages as "a higher authority," the majority elevates form over substance. Many people know large parts of the Bible by heart and can quote certain passages verbatim with persuasive alacrity, particularly when the ideas in those passages are as widespread and generally known as those referenced here. It is without doubt that a juror may relate passages of scripture from memory during deliberations, and that such recitation would not even be considered extraneous, much less prejudicial. It makes little sense, therefore, that the exact same passage in written form is somehow enshrined with an authority that the spoken or remembered passage lacks.

In so holding, the majority puts death penalty jurors in an impossible bind; jurors are instructed to make the ultimate decision about life or death based on their individual moral assessment—so long as their individual moral assessments are made from memory. This holding is demeaning to all jurors, but especially the jurors in this case, because it assumes that jurors cannot be trusted to think for themselves or follow the law in the face of written, but not spoken, religious passages.

My experience with jurors leads me to emphatically reject the majority's way of thinking. Jurors chosen to serve in death penalty cases are selected for their ability, stated under oath, to uphold the law, apply the law to the facts, and to make reasoned judgments based upon their respective backgrounds and beliefs. To presume that jurors who have a religious background cannot distinguish between the written biblical passages referenced here and the written jury instructions—a presumption that must be made in order to find prejudice in this case— is to underestimate their intelligence and to belittle their participation in our legal system.

Jurors and the juries on which they serve are an essential component of the American legal system. We entrust jurors with decisionmaking abilities in difficult legal matters for many reasons. Jurors temper the rigors of law with community standards, jurors legitimize the legal process through their participation in rendering verdicts, and jurors check the potential abuses that might result from having one person decide the fate of another. James J. Gobert & Walter E. Jordan, *Jury Selection: The Law, Art, and Science of Selecting a Jury* § 1.01 (2d ed.1990).

Though the jury system is not without flaws, it is an intrinsic element in the constitutional protections afforded by both our state and federal governments. Yet the majority opinion exhibits a complete lack of faith in the jury system and in the jurors who uphold that system, second guessing those jurors' abilities to follow the law in spite of and because of their religious backgrounds.

Because I believe that jurors have the intelligence and understanding to follow the law, both in spite of and because of their various backgrounds and beliefs, and because the passages read in this case, though extraneous, were not prejudicial, I would reverse the trial court's decision to vacate Harlan's

death sentence, and reinstate the jury's verdict.

I am authorized to say that JUSTICE KOURLIS joins in this dissent.