The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 4, 2026

**2026 COA 43**

**No. 24CA0675, *People v. Cichuniec* — Criminal Law — Parties to Offenses — Complicity — Liability Based on Behavior of Another**

A division of the court of appeals holds that, to convict a person of an offense as a complicitor, the prosecution must prove that another person committed the statutory elements of the offense but does not have to disprove any affirmative defense that the principal would be entitled to raise. The division also holds that, under section 18-1-605, C.R.S. 2025, acquittal of the principal on a charge does not require acquittal of a complicitor as to that same charge.

Court of Appeals No. 24CA0675
Adams County District Court No. 21CR2806
Honorable Mark Warner, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Peter Cichuniec,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE J. JONES
Lum and Meirink, JJ., concur

Announced June 4, 2026

Philip J. Weiser, Attorney General, Erin K. Grundy, First Assistant Attorney General, Gabriel P. Olivares, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Bruno, Colin, Goddard & Lowe, P.C., David M. Goddard, Michael T. Lowe, Denver, Colorado; Holland & Hart, LLP, Christoper M. Jackson, Denver, Colorado, for Defendant-Appellant

The Kelman Buescher Firm, Naomi Perera, Denver, Colorado, for Amicus Curiae International Association of Fire Fighters

Philip J. Weiser, Attorney General, Kurtis T. Morrison, Deputy Attorney General, Joseph G. Michaels, Assistant Solicitor General, Lane Towery, Assistant Attorney General, Denver, Colorado, for Amicus Curiae Jared S. Polis, Governor of the State of Colorado

Lewis Roca Rothgerber Christie LLP, Kendra Beckworth, Nathan B. Thoreson, Denver, Colorado, for Amicus Curiae American College of Emergency Physicians

¶ 1     Defendant, Peter Cichuniec, appeals the district court's judgment of conviction entered after a jury found him guilty of criminally negligent homicide and second degree assault.

¶ 2     The People charged Cichuniec, a paramedic, and his codefendant, Jeremy Cooper, also a paramedic, with various offenses arising out their medical treatment of Elijah McClain based on a theory that Cooper's injection of Mr. McClain with ketamine contributed to Mr. McClain's tragic death.  A jury found Cichuniec guilty of both criminally negligent homicide and second degree assault.  That same jury found Cooper guilty of criminally negligent homicide but not guilty of second degree assault.  Cooper separately appealed, and this division (with Judge Berger substituting for Judge Lum) reversed Cooper's conviction for criminally negligent homicide and remanded for a new trial on that charge.  *People v. Cooper*, 2026 COA 44.

¶ 3     We now also reverse Cichuniec's conviction for criminally negligent homicide and remand for a new trial on that charge.  But we affirm Cichuniec's conviction for second degree assault.

1

## I.     Background

¶ 4     As noted, Cichuniec and Cooper were tried together before the same jury.  The charges against each of them were the same.  We therefore provide the following background largely from the opinion resolving Cooper's appeal.

¶ 5     One summer evening, Mr. McClain walked to a convenience store and bought a few cans of iced tea.  The store's security cameras showed him wearing a black ski mask and headphones, paying for his tea, and dancing with his arms raised in the parking lot.

¶ 6     Soon after Mr. McClain left the store, a 911 caller reported a "sketchy" looking black male "walking fast" down the street wearing a black ski mask and "moving his arms."

¶ 7     Aurora police officers saw Mr. McClain.  Police body-worn cameras recorded the interaction.  When the officers asked Mr. McClain to stop, he said he had a right to walk where he was going and continued walking.  Three officers then tried to physically restrain Mr. McClain.  One repeatedly told him to "stop tensing up," and one told him to "relax or I'm going to have to change this

situation." Mr. McClain objected to being stopped, and the officers began to struggle with him.

¶ 8    As the officers continued to struggle with Mr. McClain, one of them said, "He just grabbed your gun," to one of the other officers. The officers pushed Mr. McClain to the ground. An officer tried to put Mr. McClain in a carotid control hold, whereby a person applies pressure on someone's neck with his bicep and forearm. When that effort failed, another officer put Mr. McClain in a carotid control hold. The second hold cut off blood flow to Mr. McClain's brain, causing him to temporarily lose consciousness. When Mr. McClain regained consciousness, he told the officers that he couldn't breathe. He later vomited. An officer asked a dispatcher to send paramedics to treat Mr. McClain because he had temporarily lost consciousness.

¶ 9    Cichuniec, Cooper, and two nonmedical fire department personnel (an "engineer" and a firefighter) arrived a few minutes later. They saw two officers restraining Mr. McClain on the ground. The police officers told Cichuniec and Cooper that Mr. McClain had "passed out," was "definitely on something," and was "acting crazy." One of the officers said that the officers had tried to "put a carotid

on the guy" and had done so, which "put [Mr. McClain] out."
Officers also said Mr. McClain had shown "incredible" and "crazy"
strength from "whatever he's on" and "almost did a pushup with all
three of us on his back."

¶ 10    Based on the information the officers had told them and their
visual assessment of Mr. McClain, Cichuniec and Cooper concluded
that Mr. McClain showed symptoms of a condition called "excited
delirium."[1]  They agreed they would inject Mr. McClain with
ketamine.[2]  Cooper told the officers that the paramedics would
inject Mr. McClain with ketamine once the ambulance arrived with

---

[1] "Excited (or agitated) delirium is characterized by agitation, aggression, acute distress and sudden death, often in the pre-hospital care setting.  It is typically associated with the use of drugs that alter dopamine processing, hyperthermia, and, most notably, sometimes with death of the affected person in the custody of law enforcement."  Asia Takeuchi, Terence L. Ahern & Sean O. Henderson, *Excited Delirium*, 12 W. J. of Emergency Med. 77, 77 (Feb. 2011), https://perma.cc/95WN-ZRUX.  Since the events in this case, several organizations, including the American Medical Association, the American Psychiatric Association, and the American Academy of Emergency Medicine, have rejected "excited delirium" as a legitimate medical diagnosis.  As discussed below, however, the applicable standard of care is determined as of the time of the actor's conduct.
[2] Ketamine is "a rapid-acting general anesthetic."  Mani Yavi et al., *Ketamine Treatment for Depression: A Review*, 2 Discover Mental Health, art. 9 (Apr. 15, 2022), https://perma.cc/3V4B-88CL.

the drug. (An ambulance with two emergency medical technicians (EMTs) had also been dispatched to the scene.)

¶ 11    Once the ambulance arrived, Cichuniec and Cooper determined that 500 mg of ketamine was the correct dosage to give to Mr. McClain based on his weight (which Cichuniec estimated at 187 pounds (85 kg) and Cooper estimated at about 220 pounds (100 kg)) and his degree of agitation.[3]  (In fact, Mr. McClain weighed only 143 pounds.)  Either Cichuniec or Cooper told an EMT to prepare it.  Once the EMT did so, Cooper injected it into Mr. McClain.

¶ 12    Sometime after Mr. McClain was placed in the ambulance, Cichuniec noticed that he had stopped breathing.  He told an EMT to check Mr. McClain's pulse.  When the EMT couldn't find one, the EMTs began CPR.  Mr. McClain was subsequently admitted to a hospital.  Doctors declared him brain dead a few days later.

¶ 13    A doctor with the Adams County Coroner's Office investigated the cause of death and classified it as "undetermined" as to both

---

[3] Cichuniec and Cooper testified that the dosage for ketamine is 5 mg per kg of body weight, but that the dosage may be adjusted upward if the patient is particularly "agitated."  The propriety of such an adjustment was disputed at trial.

cause and manner. The District Attorney for the Seventeenth Judicial District subsequently declined to prosecute Cichuniec and Cooper (or any of the police officers). But Governor Jared Polis later issued an executive order directing the Attorney General to investigate and, if necessary, prosecute on the State's behalf, invoking his authority under section 24-31-101(1)(a), (b), C.R.S. 2025. Colo. Exec. Order No. D 2020 115 (June 25, 2020).[4]

¶ 14   At the Attorney General's request, a forensic pathologist reviewed Mr. McClain's autopsy records and tissue samples, other experts' reports, videos of the encounter, and witness statements. He concluded that Mr. McClain had died from "[c]omplications following acute ketamine administration during violent subdual and restraint by law enforcement and emergency response personnel."

¶ 15   A state grand jury subsequently indicted Cichuniec and Cooper on one count each of reckless manslaughter and criminally

---

[4] The Governor subsequently issued two related executive orders — D 2020 246 (Nov. 10, 2020) and D 2020 267 (Dec. 2, 2020) — amending the first order to further define the "breadth and scope of the Attorney General's authority to investigate and prosecute offenses arising from" this matter.

negligent homicide and three counts each of second degree assault.[5] They were tried together. The prosecution's theory was that Cichuniec and Cooper had acted contrary to their medical training and proper protocols. And the prosecution charged that each could be found guilty of all the charges as either a principal or a complicitor.

¶ 16     A jury found Cooper guilty of criminally negligent homicide but acquitted him of all other charges. The same jury found Cichuniec guilty of criminally negligent homicide and one count of second degree assault (unlawful administration of drugs) but acquitted him of reckless manslaughter and the remaining count of second degree assault (causing serious bodily injury with intent to cause bodily injury). Cichuniec and Cooper separately appealed their convictions. This appeal is Cichuniec's.

---

[5] The second degree assault charges were for causing serious bodily injury by means of a deadly weapon (ketamine), intentionally causing psychological or mental impairment or injury by administering a drug without the victim's consent and without a medical purpose, and causing serious bodily injury with the intent to cause bodily injury. *See* § 18-3-203(1)(d), (e), (g), C.R.S. 2025. The deadly weapon charges weren't submitted to the jury.

## II.    Discussion

¶ 17    Cichuniec's contentions of error fall into three categories: (1) contentions that, if meritorious, would require us to reverse both convictions; (2) contentions that, if meritorious, would require us to reverse (or vacate) only the conviction for criminally negligent homicide; and (3) contentions that, if meritorious, would require us to reverse (or vacate) only the conviction for second degree assault.

¶ 18    The first category comprises Cichuniec's contentions that the Attorney General lacked authority to prosecute him and that the district court erred by refusing to consider a juror's post-trial affidavit concerning jury exposure to extraneous prejudicial information.  We reject both of those contentions.

¶ 19    The second category comprises Cichuniec's contentions that the evidence was insufficient to sustain the guilty verdict on the criminally negligent homicide charge, the district court erred by refusing to instruct the jury that his statutory "special relationship" defense was an affirmative defense that the prosecution was required to disprove beyond a reasonable doubt, and the court erroneously instructed the jury on the standard of care applicable to the charge of criminally negligent homicide and similarly erred by

8

refusing to clarify that concept for the jury after it indicated uncertainty as to what standard to apply. We disagree with the first two contentions, but for the reasons more fully explained in *Cooper*, ¶¶ 45-60, we agree with the third. And because we conclude that the court's instructional errors relating to the standard of care weren't harmless, we reverse Cichuniec's conviction for criminally negligent homicide and remand for a new trial on that charge.

¶ 20    The third category comprises Cichuniec's contentions that the evidence was insufficient to sustain the guilty verdict on the second degree assault charge; the district court plainly erred by failing to instruct the jury that the "special relationship" affirmative defense applied not just to the complicitor's (Cichuniec's) conduct, but also to the principal's (Cooper's) conduct; and the court erred by allowing expert witnesses to testify as to the ultimate issue in the case — whether there was a lawful medical purpose to administer ketamine to Mr. McClain. We disagree with all three of these contentions.

¶ 21    We now turn to each contention, addressing them in the order indicated above.

### A. Contentions Potentially Impacting Both Convictions

#### 1. The Attorney General's Authority to Prosecute

¶ 22    Cichuniec contends that, because the district attorney affirmatively declined to prosecute him, the Attorney General can't prosecute him pursuant to the Governor's executive orders; rather, the only way the district attorney's decision could be overridden was under Colorado's special prosecutor statute, section 16-5-209, C.R.S. 2025. His attorney filed a motion to dismiss the indictment for this reason, which the district court denied.

¶ 23    In *Cooper*, ¶¶ 25-33, the division rejected an identical contention. It reasoned that (1) the elected district attorney's authority to prosecute isn't unlimited or exclusive; (2) though section 16-5-209 provides one avenue for someone other than the district attorney to prosecute, it isn't the only such avenue; (3) another avenue is via section 24-31-101(1)(b), which the General Assembly enacted pursuant to article IV, section 1 of the Colorado Constitution; and (4) the Governor lawfully acted under section 24-31-101(1)(b) when issuing the relevant executive orders.

¶ 24    Cichuniec hasn't persuasively argued why we should depart from that reasoning. We adopt it in full and therefore conclude that

the district court didn't err by denying Cichuniec's motion to dismiss the indictment.

2.    Jury's Exposure to Extraneous Prejudicial Information

¶ 25    Cichuniec contends that he is entitled to a new trial because the jury was exposed to extraneous prejudicial information — a calendar on the courtroom wall with blank "Post-it" notes in the blocks of the calendar grid for Monday, December 25, 2023, through Friday, December 29.  He says that, seeing the calendar, the jurors would have felt pressured to finish their deliberations by Friday, December 22 (which is the day they returned their verdicts).

a.    Additional Background

¶ 26    Cichuniec's counsel filed a motion for a new trial following the verdicts.  One ground was that jurors believed the court "would not be available for deliberations between Christmas and New Year's [E]ve because of vacation time posted on the [c]ourt's calendar inside the courtroom, and the [c]ourt stating in jury selection that the case would be concluded before the Christmas holiday."  In support, counsel attached an affidavit from one of the jurors in which that juror said in relevant part as follows:

11

I believe the holiday was paramount to how we operated. The jury felt the pressure of deliberating and being deadlocked on the Friday afternoon before the Christmas holiday. Specifically, the judge's instruction to continue to deliberate was late in the afternoon just two days before Christmas. Members of the jury felt pressure to reach a unanimous verdict as opposed to remaining deadlocked to finish the process (i.e., reach a verdict) ahead of Christmas.

. . . .

Several of the jurors, including myself, talked about not wanting to be thinking about this case over the holidays and that it would be hard to enjoy our time with our families with this hanging over our heads. I believe that affected many of us, including the judge, given his planned time off and instruction late in the day to continue deliberations when we were deadlocked. During the trial my father received a terminal cancer diagnosis which weighed heavy on my mind knowing this would be the last Christmas we would be able to spend together.

. . . .

We knew the judge had PTO [paid time off] scheduled for the following week because it was on his calendar posted in the courtroom. This was observed and pointed out by one of the jurors and discussed by the jurors both before and during our deliberations. The foreman expressed that she felt bad interfering with the judge's PTO.

12

¶ 27 The prosecution responded to the motion and made a record as to the calendar described above. In denying the motion, the court also did so. It said, "The PTO on vacation 'posting' was simply IBM 'sticky' notes covering the days on a calendar beginning with Christmas and ending in the new year, excluding weekends. There was nothing to overtly suggest the court was on vacation [or] indicating the court would not be available for extended deliberations."

¶ 28 Relying on CRE 606(b), and cases applying it, the court ruled that the juror's affidavit could not be considered because it didn't disclose extraneous prejudicial information. The court denied the motion.

b. Standard of Review and Applicable Law

¶ 29 Though Cichuniec's opening brief doesn't say so expressly, his challenge to the court's conclusion that the subject portion of the juror's affidavit doesn't fall under CRE 606(b)(1)'s exception for considering juror affidavits is ultimately one to the court's denial of his motion for a new trial under Crim. P. 33. That is the context in which the affidavit was presented, and Cichuniec seeks reversal of his convictions and a new trial based on the affidavit.

¶ 30　So we must start with the standard of review applicable to a ruling on such a motion.  That standard is well settled: We review the court's ruling for an abuse of discretion.  *People v. Wadle*, 97 P.3d 932, 936 (Colo. 2004).  A court abuses its discretion in this context if its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law.  *People v. Newman*, 2020 COA 108, ¶ 9; *see Wadle*, 97 P.3d at 936.

¶ 31　"The underlying issue of whether extraneous prejudicial information was before the jury presents a mixed question of law and fact.  We review de novo the [district] court's conclusions of law, but we defer to the court's findings of fact if they are supported by competent evidence in the record."  *Newman*, ¶ 10 (citations omitted); *accord People v. Harlan*, 109 P.3d 616, 624 (Colo. 2005).

¶ 32　CRE 606(b) provides in relevant part that,

> [u]pon an inquiry into the validity of a verdict . . . , a juror may not testify . . . to the effect of anything upon that juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes in connection therewith.

14

This rule "strongly disfavors any juror testimony impeaching a verdict . . . [and] is designed to promote finality of verdicts, shield verdicts from impeachment, and protect jurors from harassment and coercion." *Harlan*, 109 P.3d at 624; *accord Clark v. People*, 2024 CO 55, ¶ 66.

¶ 33　But there are exceptions. The exception Cichuniec invokes is that "a juror may testify about . . . whether extraneous prejudicial information was improperly brought to the jurors' attention." CRE 606(b)(1). To demonstrate that a verdict must be set aside under this exception, "a party must show both that extraneous information was improperly before the jury and that the extraneous information posed the reasonable possibility of prejudice to the defendant." *Clark*, ¶ 68 (quoting *Kendrick v. Pippin*, 252 P.3d 1052, 1063 (Colo. 2011)).

¶ 34　The inquiry thus proceeds in two steps. First, "the court must determine whether the [defendant] has presented competent evidence alleging that extraneous prejudicial information was improperly before the jury. At this step, the trial court must determine as a matter of law whether the alleged information before the jury constitutes prejudicial extraneous information." *Id.* at ¶ 70

15

(citation omitted).  Second, if the court determines that the defendant has made such a showing, "the court must determine . . . whether there is a reasonable possibility that the extraneous prejudicial information influenced the verdict to the detriment of the defendant."  *Id.* at ¶ 71.  An objective standard applies to this second step.  *Id.*

¶ 35  The two inquiries obviously overlap to some extent: There is a prejudice determination at each step.  But the burdens at each step are different.  At step one, the defendant must produce evidence admissible under CRE 606(b) "that calls into question the validity of the verdict."  *Id.* at ¶ 74.  But at step two, "the [defendant] must establish adequate grounds to overturn the verdict."  *Id.* (quoting *People v. Garcia*, 752 P.2d 570, 583 (Colo. 1988)).

¶ 36  "Extraneous prejudicial information consists of (1) legal content and specific factual information (2) learned from outside the record (3) that is relevant to the issues in a case."  *Id.* at ¶ 75 (citation modified); *see also Harlan*, 109 P.3d at 624 (Extraneous information is "any information that is not properly received into evidence or included in the court's instructions.").

16

¶ 37    In this case, the district court didn't get past step one of the analysis because it concluded that the juror's affidavit didn't present evidence of information that was "extraneous" or "prejudicial."  And it therefore declined, we presume, to consider the affidavit in ruling on Cichuniec's motion for a new trial.  We turn then to whether the court erred by refusing to consider the affidavit.

### c.    Application

¶ 38    The People argue that the calendar wasn't extraneous prejudicial information because "it was posted *inside the courtroom.*" (Emphasis in the People's answer brief.)  We disagree because the calendar wasn't received into evidence or included in the court's instructions.  *Harlan*, 109 P.3d at 624; *Clark*, ¶ 75.

¶ 39    But Cichuniec's contention runs aground on the requirement of prejudice.  The prosecution made a record that the Post-it notes on the calendar's days from Christmas through New Year's Day were blank, and Cichuniec didn't allege otherwise.  And the court found that nothing about the Post-it notes "overtly suggest[ed] the court [would be] on vacation [or] indicat[ed] the court would not be available for extended deliberations."  We would add that nothing about the "sticky" notes would have indicated that a different judge

17

couldn't take the jury's verdict or that the jury couldn't resume deliberations after the new year. Though the court had previously expressed the view that the case would be over before Christmas, the court didn't promise that it would be or tell the jurors that it had to be.[6]

¶ 40 We therefore conclude that the district court didn't err by refusing to consider the juror's affidavit. *See Harlan*, 109 P.3d at 626 (indicating that among the factors a court should consider in determining prejudice are "how the extraneous information relates to critical issues in the case" and "whether the information would be likely to influence a typical juror to the detriment of the defendant"); *see also id.* at 625 (an objective test applies to ascertaining prejudice). And because Cichuniec doesn't challenge the denial of his motion for a new trial premised on pressure to return a verdict on any other basis, we conclude that the district court didn't abuse its discretion by denying the motion.

---

[6] To the extent any of the jurors wanted to be finished with their service before Christmas, that wasn't legal or factual information improperly brought to the jurors' attention and therefore wasn't extraneous information for the purpose of CRE 606(b)(1).

B. Contentions Relating Only to Criminally Negligent Homicide

¶ 41    As noted, as to his conviction for criminally negligent homicide, Cichuniec challenges the sufficiency of the evidence and asserts two errors relating to the jury instructions.  We address his sufficiency challenge first because if he is right that the evidence was insufficient, we must vacate the conviction and he can't be retried on that charge.  *McDonald v. People*, 2021 CO 64, ¶ 62.

1.    Sufficiency of the Evidence

¶ 42    The court instructed the jury to consider Cichuniec's culpability for criminally negligent homicide as both the principal and a complicitor.  The verdict forms don't indicate whether the jury found him guilty as the principal or as a complicitor.

¶ 43    On appeal, Cichuniec contends that (1) the evidence was insufficient to support a verdict finding him guilty as a principal because Cooper requested and administered the ketamine and therefore Cichuniec couldn't have "caused" Mr. McClain's death, and (2) the evidence was insufficient to support a verdict finding him guilty as a complicitor because there was no evidence that he knew "Cooper was engaging in criminally negligent conduct."  We

conclude that the evidence was sufficient to find Cichuniec guilty as both the principal and as a complicitor.

### a. Standard of Review

¶ 44 In evaluating the sufficiency of the evidence, "we ask whether the evidence, 'viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *Gorostieta v. People*, 2022 CO 41, ¶ 16 (quoting *People v. Harrison*, 2020 CO 57, ¶ 32). We defer to the jury's assessments of witness credibility and conflicting evidence. *Montoya v. People*, 2017 CO 40, ¶ 19. And we give the prosecution the benefit of every inference that may reasonably be drawn from the evidence. *People v. Perez*, 2016 CO 12, ¶ 25.

### b. Analysis

#### i. Applicable Law

¶ 45 To find Cichuniec guilty of criminally negligent homicide as a principal, the jury had to find, beyond a reasonable doubt, that he (1) "cause[d]" Mr. McClain's death (2) "by conduct amounting to criminal negligence." § 18-3-105, C.R.S. 2025.

¶ 46　"A defendant's conduct is a cause of a victim's death in a criminal homicide if the conduct 'began a chain of events the natural and probable consequence of which was the victim's death.'" *People v. Reynolds*, 252 P.3d 1128, 1131 (Colo. App. 2010) (quoting *People v. Lopez*, 97 P.3d 277, 280 (Colo. App. 2004)); *accord People v. Saavedra-Rodriguez*, 971 P.2d 223, 225 (Colo. 1998).

¶ 47　"A person acts with criminal negligence when, through a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(3), C.R.S. 2025.

¶ 48　As we discuss below, a "reasonable person" in this context is "a reasonable person with the actor's knowledge and experience." *Mata-Medina v. People*, 71 P.3d 973, 978 (Colo. 2003) (quoting *People v. Hall*, 999 P.2d 207, 216 (Colo. 2000)); *see also Cooper*, ¶ 51 ("[A] reasonable person in this context is a reasonable person in the actor's situation and under all the circumstances known to him . . . ."). In this case, that means a reasonable paramedic in

21

Aurora, Colorado, in 2019 treating a person in Mr. McClain's condition.

¶ 49    To find Cichuniec guilty as a complicitor, rather than as the principal, the jury also had to find, beyond a reasonable doubt, that he intended to promote or facilitate Cooper's commission of the offense and aided, abetted, advised, or encouraged Cooper in planning or committing the offense. § 18-1-603, C.R.S. 2025. The Colorado Supreme Court has interpreted the complicity statute to require proof beyond a reasonable doubt that the complicitor had a "dual mental state," meaning that the complicitor must have had

> (1) the intent, in the commonly understood sense of desiring or having a purpose or design, to aid, abet, advise, or encourage the principal in his criminal act or conduct, and (2) an awareness of those circumstances attending the act or conduct he seeks to further that are necessary for commission of the offense in question.

*People v. Childress*, 2015 CO 65M, ¶ 29. "[C]ircumstances attending the act or conduct" means "those elements of the offense describing the prohibited act itself and the circumstances surrounding its commission." *Id.*; *accord People in Interest of B.D.*, 2020 CO 87, ¶ 12.

22

## ii. Culpability as the Principal

¶ 50    Cichuniec contends that the evidence was insufficient to establish his guilt as the principal because there was no evidence that he caused Mr. McClain's death.[7]  He argues that only Cooper could have acted as the principal because (1) Cooper "requested and administered the ketamine"; (2) Cooper "was the chief medic on the scene, the one with final decision-making power"; and (3) he — Cichuniec — "did not issue a directive to administer ketamine" but, "at most, . . . agreed with Cooper's assessment that Cooper should administer the 500 mg dose."  We conclude, however, that Cichuniec takes too narrow a view of causation and that there is sufficient evidence from which the jury could reasonably have found that he caused Mr. McClain's death.  That evidence includes the following:

- Cichuniec was the highest ranking fire department responder on the scene, and he testified that he "was in charge of my crew on day-to-day activities."

_____

[7] Cichuniec doesn't challenge the sufficiency of the evidence as the principal as to any other element of the offense.

23

- Cichuniec agreed that a dosage of 500 mg was appropriate based on Mr. McClain's weight and "agitation." Cichuniec overestimated Mr. McClain's weight by forty-five pounds. He testified that the proper dosage for a person of Mr. McClain's weight was 325 mg. And he testified that the dosage for a person weighing 85 kg (what he estimated Mr. McClain weighed) was 425 mg. And though Cichuniec believed that an increase to 500 mg was justified based on Mr. McClain's agitated state, there was evidence, albeit conflicting, that doing so was contrary to protocol and was in contravention of his training; that is, agitation was not a medical basis to increase the dosage and was not indicated to be during his training. He admitted at trial that the dosage given to Mr. McClain was "more than 50 percent more than what [Mr. McClain] should have been given."

- There was testimony that Mr. McClain was not as agitated when the paramedics tended to him as when he had previously been struggling with the officers. He had briefly lost consciousness before the paramedics arrived.

24

So Cichuniec based his diagnosis of excited delirium — which he used to justify an increased dose — on Mr. McClain's state before he arrived on the scene, not his state when he arrived on the scene.

- Cichuniec testified that he — not Cooper — told the medic on the scene "to draw up 500 [mg] of ketamine."

- Though Cichuniec had been trained to speak with the patient, if possible, before diagnosing a patient with excited delirium, he didn't speak with Mr. McClain before deciding to administer ketamine or at any time before it was administered. Nor did he or Cooper take Mr. McClain's pulse, as they had been trained to do.

- Cichuniec agreed on cross-examination that he and Cooper "jointly" agreed to administer ketamine.

- Though Cichuniec's training called for monitoring Mr. McClain's condition after Cooper injected the ketamine, neither he nor Cooper engaged in such monitoring until after Mr. McClain was placed in the ambulance.

- Expert witnesses testified that the ketamine was a substantial contributing factor in Mr. McClain's death.

¶ 51    From this evidence, the jury could reasonably have concluded that Cichuniec began a chain of events that in natural and probable consequence caused Mr. McClain's death.  *See Saavedra-Rodriguez,* 971 P.2d at 225.  Though Cichuniec paints himself as someone merely going along with Cooper's decision, there was evidence that the decision was jointly made and based on a gross deviation from the standard of care.  There was also evidence from which the jury could reasonably have inferred that Cichuniec, as the ranking officer, had the authority to override Cooper's assessment.  We therefore reject Cichuniec's challenge to the sufficiency of the evidence to find him guilty as the principal.[8]

¶ 52    Barring any independent reversible error, this conclusion obviates any need to assess the sufficiency of the evidence to find Cichuniec guilty as a complicitor.  But we now address that question out of an abundance of caution.

---

[8] Though we don't conclude that the evidence in this regard was overwhelming given the totality of the evidence introduced at trial, that isn't the applicable test.

### iii. Culpability as a Complicitor

¶ 53    Cichuniec contends that the evidence was insufficient to establish his guilt as a complicitor.  Specifically, he argues that there was insufficient evidence of an aspect of the required mental state — that he knew "Cooper failed to perceive a substantial and unjustified risk through a gross deviation from the standard of care."  Again, we disagree.

¶ 54    Just as the jury could reasonably have concluded from the evidence recounted above that Cichuniec grossly deviated from the standard of care, it could reasonably have concluded that he knew Cooper was doing so as well.  He received the same training as Cooper, they worked together on the scene in all aspects of Mr. McClain's treatment, and they jointly decided to inject Mr. McClain with 500 mg of ketamine.  Though there may be no direct evidence of Cichuniec's state of mind — or Cooper's for that matter — such evidence wasn't required; a jury's determination of a defendant's state of mind can be based on reasonable inferences drawn from the evidence.  *People v. Chastain*, 733 P.2d 1206, 1212 (Colo. 1987) (because direct evidence of a defendant's state of mind is rarely available, a jury must often resort to considering circumstantial

27

evidence in determining that element); *Garcia v. People*, 473 P.2d 169, 170 (Colo. 1970) ("[T]he uniform rule is[] that the mind of an alleged offender may be read from his acts, his conduct and the reasonable inferences which may be drawn from the circumstances of the case.").

## 2. Standard of Care

¶ 55    Cichuniec next contends that the district court erred by (1) rejecting his counsel's tendered instruction saying that a reasonable person for purposes of the criminally negligent homicide charge is a reasonable paramedic in Aurora, Colorado, in 2019; and (2) failing to adequately and accurately define the standard of care after the deliberating jurors affirmatively indicated that they didn't understand what standard to apply.

¶ 56    The division addressed these very same contentions in Cooper's appeal.  It held that the district court erred on both accounts because the correct standard for a charge of criminally negligent homicide is that of "a reasonable person in the actor's situation and under all the circumstances known to him."  *Cooper*, ¶ 51.  The division more specifically set forth the standard in that case as "a reasonable paramedic in Aurora, Colorado, in 2019

treating a person in Mr. McClain's condition." *Id.* at ¶ 52. It reversed Cooper's conviction because it concluded that the errors weren't harmless. *Id.* at ¶¶ 58-59.

¶ 57 We agree with the *Cooper* division's analysis, and we don't see any basis for treating Cichuniec differently. The two were tried on identical theories of guilt and the evidence against them was, while not identical, sufficiently similar that we can't conclude that the errors were harmless as to Cichuniec.

¶ 58 We therefore reverse Cichuniec's conviction for criminally negligent homicide and remand the case for a new trial on that charge (should the People so elect).

### 3. The "Special Relationship" Jury Instruction

¶ 59 Like Cooper, Cichuniec also contends that the district court erred by refusing to instruct the jury that, as to criminally negligent homicide, section 18-1-703(1)(e)(II), C.R.S. 2025, of Colorado's "special relationships" statute creates an affirmative defense that the prosecution must disprove beyond a reasonable doubt.[9] That statute provides in relevant part as follows:

---

[9] We address this issue because it is likely to arise on remand. *See People v. Schnorenberg*, 2025 CO 43, ¶¶ 15, 59.

> The use of physical force upon another person that would otherwise constitute an offense is justifiable and not criminal . . . [if a] duly licensed physician, advanced practice registered nurse, or a person acting under his or her direction . . . use[s] reasonable and appropriate physical force for the purpose of administering a recognized form of treatment that he or she reasonably believes to be adapted to promoting the physical or mental health of the patient if . . . [t]he treatment is administered in an emergency when the physician or advanced practice registered nurse reasonably believes that no one competent to consent can be consulted and that a reasonable person, wishing to safeguard the welfare of the patient, would consent.

§ 18-1-703(1)(e)(II).  The district court instructed the jurors, over Cichuniec's counsel's objection, that "with respect to criminally negligent homicide, the prosecution does not have an additional burden to disprove use of physical force (special relationship).  You are instructed, though, that a person does not act recklessly or in a criminally negligent manner if his conduct is legally justified as set forth above."  (The court instructed the jury "above" on the content of the special relationship defense.)

¶ 60     Cooper made the same argument in his appeal.  But the division held that, as to the offense of criminally negligent homicide, the special relationship defense is a traverse rather than an

30

affirmative defense; accordingly, it rejected Cooper's argument. *Cooper*, ¶¶ 66-69.

¶ 61 Again, we don't see any reason to hold differently in this case. Therefore, in the event the People choose to retry Cichuniec on this charge, the district court shouldn't instruct the jury on the special relationship defense as an affirmative defense.

C. Contentions Relating Only to Second Degree Assault

¶ 62 We turn next to Cichuniec's contentions implicating only the guilty verdict for second degree assault (unlawful administration of drugs). These are, generally stated, (1) the evidence of guilt was insufficient; (2) the court erred in instructing the jury; and (3) the court erroneously admitted certain expert testimony.

1. Sufficiency of the Evidence

¶ 63 Cichuniec contends that the evidence was insufficient to find him guilty of second degree assault under section 18-3-203(1)(e), C.R.S. 2025, for two reasons. First, because Cichuniec could only be charged with this offense as a complicitor and the jury acquitted the principal — Cooper — of the same charge under the same evidence, the proof necessarily failed as to the element that the underlying crime was committed by another person. Second, there

was insufficient evidence to prove beyond a reasonable doubt one aspect of the required mental state — that Cichuniec knew Cooper was acting for a purpose other than lawful medical or therapeutic treatment. We reject both contentions.

### a. Additional Background

¶ 64 As noted, at the time of trial, both Cichuniec and Cooper were charged with two counts of second degree assault, corresponding to two ways of committing that offense under section 18-3-203(1). The jury acquitted Cooper of both of those charges. Although the jury acquitted Cichuniec of one of those charges, it found him guilty of the charge brought under section 18-3-203(1)(e). That provision says that

> [a] person commits the crime of second degree assault if . . . [,] [f]or a purpose other than lawful medical or therapeutic treatment, he intentionally causes stupor, unconsciousness, or other physical or mental impairment or injury to another person by administering to him, without his consent, a drug, substance, or preparation capable of producing the intended harm.

¶ 65 Though the People charged Cichuniec with this offense as both a principal and a complicitor, the evidence at trial showed that Cooper administered the ketamine; therefore, Cichuniec could only

32

be found guilty as a complicitor. The People conceded below that Cooper injected the ketamine. And on appeal, they don't argue that there is any evidentiary basis to uphold Cichuniec's conviction on a theory that he was the principal. Rather, they limit their arguments to Cichuniec's culpability as a complicitor.[10] We therefore take Cichuniec's assertion that the guilty verdict can't be upheld on the basis of principal culpability to be conceded by the People.

¶ 66    Complicity is "a theory by which a defendant becomes accountable for a criminal offense committed by another." *Grissom v. People*, 115 P.3d 1280, 1283 (Colo. 2005) (quoting *People v. Thompson*, 655 P.2d 416, 418 (Colo. 1982)). Section 18-1-603 — the complicity statute — says that "[a] person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense."

> [L]iability under this provision requires: (1) the intent to aid, abet, advise, or encourage the principal in his criminal act or conduct and (2)

---

[10] The jury wasn't asked to indicate whether it found either defendant guilty of any of the charges as the principal or as a complicitor.

an awareness of "those elements of the offense describing the prohibited act itself and the circumstances surrounding its commission, including a required mental state, if any," that are necessary for commission of the offense in question.

*Butler v. People*, 2019 CO 87, ¶ 12 (quoting *Childress*, ¶ 29). It also requires proof that the principal committed the underlying crime. *People v. Douglas*, 2012 COA 57, ¶ 12.

¶ 67 One other fact relating to the jury instructions bears on Cichuniec's contentions challenging the verdict. As to this charge, the court instructed the jury in the instruction setting forth the elements of the offense that, in addition to finding beyond a reasonable doubt all the elements, the jury also had to find that the prosecution had disproved the "special relationship" defense discussed above beyond a reasonable doubt to find the defendant guilty.

b. Inconsistent Verdicts

¶ 68 Relying on *People v. Shockey*, 2023 COA 121 (*Shockey I*), *rev'd*, 2026 CO 10 (*Shockey II*), Cichuniec argues that the jury's acquittal of Cooper as the principal on this charge is legally inconsistent with its verdict finding him guilty of the charge, and therefore the verdict

34

against him cannot stand. But putting aside the fact *Shockey I* dealt with a much different kind of inconsistency than the one Cichuniec raises, the division's decision in that case was recently reversed by the supreme court. In reversing the division's decision, the supreme court discussed the following principles of inconsistent verdicts relevant to our analysis:

- Inconsistencies between verdicts — including inconsistencies between guilty and not guilty verdicts — are generally permissible. *Shockey II*, ¶ 17.

- "Verdicts that appear logically inconsistent may still be upheld when there is no legal inconsistency rendering them mutually exclusive." *Id.* at ¶ 21.

- "Jury verdicts will not be reversed for inconsistency if a reading of the record reveals any basis for the verdicts." *Id.* (quoting *City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo. 1981)).

¶ 69 Elsewhere, the supreme court has observed that it has permitted inconsistent guilty and not guilty verdicts. *People v. Delgado*, 2019 CO 82, ¶ 24. This is because such verdicts aren't necessarily mutually exclusive: "A guilty verdict is a specific finding,

35

encompassing all the elements of the crime. An acquittal isn't. In other words, while an acquittal has various explanations, a guilty verdict has but one." *Id.* at ¶ 26. Among the possible explanations for a not guilty verdict (in addition to failure to prove an element) are "mistake, compromise, or lenity . . . . [T]he most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Id.* at ¶ 25 (quoting *United States v. Powell*, 469 U.S. 57, 63, 65 (1984)).

¶ 70    The verdicts in this case aren't legally inconsistent. The jury could have found that Cooper committed all the elements of the offense — that is, that the offense was committed — but that, as to him, the prosecution had failed to disprove the "special relationship" affirmative defense beyond a reasonable doubt. If the jury so found, the requirement for complicitor culpability that the offense was committed by another was satisfied.[11] Indeed, in this

---

[11] This conclusion implicates Cichuniec's contention, which we address and reject below, that he — as a complicitor — was entitled to the benefit of the principal's affirmative defense.

way the record reveals a basis for the apparently inconsistent verdicts. *See Shockey II*, ¶ 21.

¶ 71 Also, the not guilty verdict for Cooper on this charge could have been based on a mistake, compromise, or lenity. In that event, there is no legal inconsistency either. *See Delgado*, ¶¶ 24-26.

¶ 72 Cichuniec's claim of impermissibly inconsistent verdicts also runs headlong into section 18-1-605, C.R.S. 2025, which says that "it is no defense [to criminal liability based on another's behavior under section 18-1-603] that the other person has not been prosecuted for or convicted of any offense based upon the behavior in question." We think that by explicitly refusing to allow a defendant charged as a complicitor to benefit from the failure to convict the principal, the General Assembly necessarily refused to allow a complicitor to avoid conviction based on the principal's acquittal.

¶ 73 For these reasons, we reject Cichuniec's insufficiency of the evidence argument based on inconsistent verdicts.

### c. State of Mind

¶ 74 According to Cichuniec, "[b]y all accounts, Cooper and Cichuniec subjectively believed what they were doing *was* for a

lawful medical or therapeutic treatment." And he says the prosecution's theory was that "they were wrong in that belief, and that they were negligent in holding that belief." Putting these two things together, Cichuniec argues that they preclude as a matter of law any factual determination that he knew Cooper didn't believe he was administering ketamine for a lawful medical or therapeutic purpose. Viewing the evidence in the light most favorable to the jury's verdict, *see Gorostieta*, ¶ 16; *Perez*, ¶ 25, we conclude that sufficient evidence supports a finding that Cichuniec had the requisite state of mind.

¶ 75 The evidence discussed above in the context of the criminally negligent homicide verdict applies equally to Cooper and Cichuniec. From that evidence, the jury could reasonably have found that Cooper departed so far from the standard of care that he must have known ketamine wasn't medically called for, that Cichuniec knew that as well, and that Cichuniec knew that Cooper was grossly deviating from the standard of care. Though Cichuniec points to his testimony and Cooper's supporting contrary findings, the jury wasn't required to credit that testimony. *See People v. Kessler,*

2018 COA 60, ¶ 12 ("[A] fact finder . . . may believe all, part, or none of a witness's testimony . . . .").[12]

## 2. "Special Relationship" Affirmative Defense

¶ 76    Next, Cichuniec contends that although the court included the "special relationship" affirmative defense in the elemental instruction for the second degree assault charge, it should also have instructed the jury in connection with the complicity instruction that, for it to find that the principal "committed the crime of assault" — a prerequisite to complicitor culpability — it also had to find that the principal's conduct wasn't authorized by the "special relationship" affirmative defense.  We disagree.

### a.    Additional Background

¶ 77    As noted, the People charged Cichuniec with second degree assault (unlawful administration of drugs) as both the principal and a complicitor.  And the court instructed the jurors that they could find him (and Cooper) guilty either as the principal or as a complicitor on all charged offenses.  But as to this offense, Cichuniec argues, and the People have conceded, that he could only

---

[12] As discussed below, Cichuniec didn't have to know Cooper's state of mind to be guilty as a complicitor.

39

be found guilty as a complicitor because Cooper administered the

ketamine. With respect to complicitor culpability for this offense,

the court instructed the jury as follows:

> For the assault in the second degree (unlawful administration of drugs), a defendant may either be a principal or a complicitor.
>
> Complicity is not a separate crime. Rather, it is a legal theory by which one person may be found guilty of a criminal offense that was committed by another person.
>
> For the defendant to be found guilty as a complicitor of the crime of assault in the second degree (unlawful administration of drugs), as defined at the end of this Instruction, the prosecution must prove each of the following conditions beyond a reasonable doubt:
>
> 1. Another person or persons must have committed the crime of assault in the second degree (unlawful administration of drugs),
>
> 2. the defendant, with the desire or the purpose or design to aid, abet, advise, or encourage the other person or persons in planning or committing that crime,
>
> 3. aided, abetted, advised, or encouraged the other person or persons in planning or committing that crime,
>
> 4. the defendant was aware of element numbers 1, 2, 3, 4, 6, and 7 of that crime, as defined at the end of this Instruction,

40

5. and the defendant's conduct was not legally authorized by the affirmative defense in Instruction 26.

For purposes of this Instruction, another person committed the crime of assault in the second degree (unlawful administration of drugs) if the prosecution proves each of the following elements beyond a reasonable doubt:

1. That the other persons or persons,

2. in the State of Colorado, in the County of Adams, on or about August 24, 2019,

3. intentionally,

4. for a purpose other than lawful medical or therapeutic treatment,

5. caused stupor, unconsciousness, or other physical or mental impairment or injury to Elijah McClain,

6. by administering a drug, substance, or preparation capable of producing the intended harm,

7. without that person's consent.

After considering all the evidence, if you decide the prosecution has proven each of the conditions of complicity liability beyond a reasonable doubt, you should find the defendant guilty of assault in the second degree (unlawful administration of drugs).

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the conditions of complicity liability

beyond a reasonable doubt, you should find the defendant not guilty of assault in the second degree (unlawful administration of drugs).

¶ 78    With respect to the elements of second degree assault (unlawful administration of drugs), this instruction tracked a different instruction setting forth those elements that applied to each defendant's culpability as the principal.  But unlike that instruction, the complicity instruction didn't include the requirement that the jury also find "that the defendant's conduct was not authorized by the affirmative defense in Instruction 26." Instruction 26 explained that "special relationship" affirmative defense, setting forth its elements as follows:

> The defendant was legally authorized to use physical force upon another person if:
>
> 1. he was a duly licensed paramedic acting under the direction of a duly licensed physician, and
>
> 2. he used reasonable and appropriate physical force for the purpose of administering a recognized form of treatment that he reasonably believed to be adapted to promoting the physical or mental health of the patient, and
>
> 3. the treatment was administered in an emergency when the duly licensed paramedic acting under the direction of a duly licensed

42

> physician reasonably believed that no one
> competent to consent could be consulted and
> that a reasonable person, wishing to safeguard
> the welfare of the patient, would consent.

It went on to tell the jury that the prosecution had the burden to disprove this affirmative defense beyond a reasonable doubt. It is the absence of similar language in the complicity instruction for this offense with which Cichuniec takes issue.

### b.     Standard of Review

¶ 79     Cichuniec's contention challenges the legal sufficiency of the complicity instruction. "We review jury instructions de novo to determine whether a particular instruction accurately informed the jury of the governing law." *People v. Maloy*, 2020 COA 71, ¶ 54 (citing *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011)); *see also Martinez v. People*, 2024 CO 48, ¶ 10 (applying this test to the question whether a defense qualified as an affirmative defense). Because Cichuniec's counsel didn't raise this issue below, if we determine that the court erred by not sua sponte adding the requirement to disprove the special relationship affirmative defense (as to the principal) to the complicity instruction, we must then determine whether that error was plain. An error is plain only if it

43

was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 14.

### c.    Analysis

¶ 80    The gist of Cichuniec's argument is that, for complicitor culpability purposes, the prosecution can't prove that "[a]nother person must have committed the crime" — an element of complicitor culpability — unless it also disproves any affirmative defense that the other person (the principal) would be entitled to raise as to that crime. This argument misapprehends what commission of the crime means in this context.

¶ 81    Section 18-1-603 — the complicity statute — provides that a person can be "legally accountable . . . for the behavior of another constituting a criminal offense." "'[O]ffense' . . . mean[s] a violation of, or conduct defined by, any state statute for which a fine or imprisonment may be imposed." § 18-1-104(1), C.R.S. 2025.[13] Thus, we look to the statute defining the offense to determine what conduct constitutes the offense. This, in turn, means that an

---

[13] For the purposes of the Criminal Code, "[t]he terms 'offense' and 'crime' are synonymous." § 18-1-104(1), C.R.S. 2025.

offense is defined by its statutory elements. *Doubleday v. People*, 2016 CO 3, ¶ 24 ("[T]o establish the commission of a predicate 'crime' . . . requires the prosecution to prove beyond a reasonable doubt each of the elements of that crime.").

¶ 82     This concept of "offense" carries over to the complicity context. In *People in Interest of B.D.*, 2020 CO 87, the supreme court addressed whether the requirement of proving that the complicitor was aware of all circumstances necessary for the commission of the offense, *see Childress*, ¶ 29, means that the prosecution must prove an awareness of a sentence enhancer applicable to that offense. The court held that no such proof is required because a sentence enhancer is not an element of the offense. All that must be proved are the statutory elements of the offense. *People in Interest of B.D.*, ¶¶ 12, 13 ("An individual *commits* an offense when he completes all the statutory elements of that offense."); *see also Butler*, ¶ 12. And in *Childress*, the supreme court made clear that (1) the underlying offense is defined by its elements as set forth in the relevant statute and (2) a complicitor need not have the same state of mind as the principal. *Childress*, ¶¶ 29, 34.

¶ 83    It is true that an affirmative defense is analogous in one limited way to an element of an offense: It is something in addition to the elements of the offense that the prosecution must disprove beyond a reasonable doubt.  *See People v. Gallegos*, 2025 CO 41M, ¶¶ 14-15.  But while it is treated like an element in this limited way, it isn't a true element of the offense.  Rather, "[a]n affirmative defense essentially admits the defendant's commission of the elements of the charged act but seeks to justify, excuse, or mitigate the commission of the act."  *Id.* at ¶ 13 (quoting *Roberts v. People*, 2017 CO 76, ¶ 20); *see People v. Garcia*, 113 P.3d 775, 784 n.12 (Colo. 2005) ("While a claimed affirmative defense is treated like an element of the offense, '[p]roof of an affirmative defense is separate and distinct from proof of the elements of [that] offense.'" (quoting *Gorman v. People*, 19 P.3d 662, 668 (Colo. 2000))).  Thus, the principal's entitlement to assert an affirmative defense is irrelevant to a complicitor's culpability.  *See People v. Moore*, 877 P.2d 840, 847 n.15 (Colo. 1994) (whether the principal might or might not be convicted because she could assert various affirmative defenses was "not germane" to whether a complicitor could be found guilty); *see also People v. McCoy*, 944 P.2d 584, 587-88 (Colo. App. 1996)

(expert testimony about the principal's mental state was properly excluded because "it is only [the] defendant's mental state that is relevant").

¶ 84    We therefore conclude that, in the context of complicitor culpability, the prosecution's burden of proving that another person committed the offense requires only proof that the principal committed the statutory elements of the offense.  It follows that the district court wasn't required to instruct the jury that, in addition to proving Cooper's (the principal's) commission of the elements of second degree assault (unlawful administration of drugs), the prosecution was also required to prove that the special relationship affirmative defense wasn't applicable to Cooper's (the principal's) conduct.[14]

---

[14] We also observe that Cichuniec's argument would appear to be in tension with section 18-1-605, C.R.S. 2025, which, as previously noted, provides that it isn't a defense to complicitor culpability that the principal "has not been prosecuted for or convicted of any offense based upon the behavior in question or has been convicted of a different offense or degree of offense."  Under this statute, a person may be guilty as a complicitor even if the principal isn't found guilty of the offense and even if the principal is found guilty of a lesser offense.  This implies that the principal may have defenses that don't apply to a complicitor.

¶ 85   But even if the court erred, the error wasn't obvious. *See Hagos*, ¶ 14; *People v. Crabtree*, 2024 CO 40M, ¶¶ 48-67 (obviousness of an error is determined as of the time the error was made). "An error is obvious if it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law." *People v. Shannon*, 2024 COA 41, ¶ 37. Cichuniec hasn't cited any source of legal authority clearly requiring the instruction for which he advocates. *See People v. Dominguez*, 2026 CO 30, ¶¶ 33-38 ("Absent clear, settled, on-point legal authority, . . . by definition, any error was not obvious . . . ."). Accordingly, any error wasn't plain.

### 3.   Expert Testimony

¶ 86   Cichuniec contends that three medical experts — Drs. David Beuther, Damon Robinson, and Roger Mitchell — gave testimony that usurped the jury's role by opining that there was no medical or therapeutic reason to administer ketamine to Mr. McClain. We disagree.

## a. Additional Background

¶ 87    Dr. Beuther testified for the People as an expert in critical care medicine and pulmonary medicine.  During direct examination, the following colloquy took place:

> Q. And based on your training and experience, at this point[15] does Mr. McClain need ketamine?
>
> A. No, not based on my training and experience.
>
> . . . .
>
> Q. Do you have an opinion based on a reasonable degree of medical certainty whether Elijah McClain would've been better off if the paramedics had never arrived and given him ketamine —
>
> . . . .
>
> A. I think that's difficult to say because he needed medical attention right there on the ground.  Before he was given ketamine he needed emergent medical attention at that point.  So I would've called 911 if I saw him like that at that moment to try to get some help and get him to a hospital.  So I don't think the right answer is do not have paramedics, the right answer was not to give him ketamine.

---

15 Read in context, "at this point" meant the point when Cooper injected Mr. McClain with ketamine.

Defense counsel didn't object to the first question and answer at all and only objected to the second question on the ground that it was leading.

¶ 88    Dr. Robinson testified for the prosecution as an expert in anesthesiology, excited delirium, hypoxia, acidosis, aspiration, and ketamine. During direct examination, the prosecutor asked, "[B]ased on your review of the materials, did you form an opinion to a reasonable degree of medical certainty whether or not there was a medical or therapeutic reason to give ketamine to Elijah McClain on August 24, 2019?" Dr. Robinson replied, "I didn't see a medical reason to give ketamine to Elijah McClain, no." Defense counsel didn't object.

¶ 89    Dr. Mitchell testified for the prosecution as an expert in forensic pathology, cause and manner of death, excited delirium, and in-custody deaths. The prosecutor asked, "Did [ketamine] have any medical purpose for Mr. McClain in this situation?" Dr. Mitchell replied, "Not that I could see, no." Again, defense counsel didn't object.

¶ 90    "We review a trial court's admission of expert testimony for an abuse of discretion and will reverse only when that decision is manifestly erroneous."  *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011).  Because defense counsel either didn't object to the testimony at issue or objected on a different ground than that which Cichuniec now asserts on appeal, we review any error in admitting any of this testimony for plain error.  *See People v. Ujaama*, 2012 COA 26, ¶¶ 37-38.[16]

c.    Analysis

> "[Expert t]estimony in the form of an opinion or inference" isn't objectionable merely because it embraces an ultimate issue to be decided by the fact finder, CRE 704, but an expert witness can't tell the jury what result to reach or form conclusions for the jurors that they are competent to reach on their own.

*People v. Baker*, 2019 COA 165, ¶ 14, *aff'd*, 2021 CO 29.  In determining whether the testimony in question crossed the line, we may consider whether (1) the testimony was clarified on cross-

---

[16] Cichuniec argues that his challenges were preserved.  But he cites objections in the record to different testimony altogether.  And his counsel never objected that the experts were usurping the jury's function.

examination; (2) the expert expressed an opinion of the applicable law or legal standard; (3) the jurors were properly instructed on the law and that they could accept or reject the expert's opinion; and (4) the expert opined that the defendant committed an offense or likely did so. *Rector*, 248 P.3d at 1203.

¶ 91 None of the expert witnesses testified that Cichuniec had committed any offense or that there was a particular likelihood that he had done so. None of them expressed an opinion on the applicable law or legal standards or purported to apply the law to the facts of the case. And none of them told the jurors what result to reach. Rather, each of them opined on the medical propriety of a particular form of medical treatment. *Cf. id.* (doctor's expert testimony that he diagnosed the victim as having been subjected to child abuse as that term is used in the medical field didn't usurp the jury's role to determine whether the defendant was legally liable for child abuse); *State v. Lockett,* No. A-0249-23, 2026 WL 732802, at *2, *5 (N.J. Super. Ct. App. Div. Mar. 16, 2026) (unpublished opinion) (doctor's testimony that without having received medical attention the victim would have died didn't usurp the jury's role to

determine whether the defendant created a substantial risk of death).

¶ 92     We therefore conclude that none of the expert testimony Cichuniec challenges on appeal was inadmissible.

D.    Cumulative Error

¶ 93     Lastly, Cichuniec contends that even if none of the errors he asserts individually requires reversal, the cumulative effect of those errors does. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24. But we have found only one error; therefore, the cumulative error doctrine doesn't apply. *Id.*; *People v. Jones*, 2025 COA 43, ¶ 56 (*cert. granted on other grounds* Jan. 20, 2026); *People v. Thames*, 2019 COA 124, ¶ 69.

III.    Disposition

¶ 94     The judgment of conviction on the charge of criminally negligent homicide is reversed, and the case is remanded for a new trial on that charge. The judgment of conviction on the charge of second degree assault is affirmed.

JUDGE LUM and JUDGE MEIRINK concur.